UNITED STATES DISTRICT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

XIAOLU "PETER" YU,

                                    Plaintiff,

            - against -                         CASE NO. 13-cv-04373 (HB)

VASSAR COLLEGE,

                                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NESENOFF & MILTENBERG, LLP
Attorneys for Plaintiff
363 Seventh Avenue - 5th Floor
New York, New York 10001
(212) 736-4500

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES………………………………………………………..………ii-iii

PRELIMINARY STATEMENT……………………………………………………………….1

STATEMENT OF THE CASE…………..……………………………………………….....2

    A.  The Night Of February 18, 2012……………………………………………..2

    B.  February 19, 2012 To February 18, 2013: A Year Passes…………………….....3

    C.  February 18, 2013 To February 26, 2013: The Complaint and Investigation………….3

    D.  February 27, 2013 To March 4, 2013: Charges and File Disclosure To Yu…………….5

    E.  March 7, 2013: The Rushed Star Chamber Hearing…………………………………6

        1. The All Faculty Hearing Panel……………………………………………6

        2. The Hearing "Evidence."………………………………………………….7

        3. The Hearing Decision………………………………………………….9

    F.  March 8, 2013: Yu's Expulsion From Vassar College……………………………10

    G.  The "Appeal."…………………………………………………………..11

    H.  The Damage to Yu………………………………………………………..11

    I.  Yu's Federal Court Complaint and Litigation……………………………….....12

SUMMARY JUDGMENT PRINCIPLES………………………………………………13

ARGUMENT……………………………………..…………………………………....14

    I.    Peter Yu Has a Meritorious Title IX Claim…..……………………………14

        a.  The Evidence Shows an Erroneous Outcome From a Flawed Proceeding That Resulted From Anti-Male Gender Bias……………………………………14

            i.  Vassar's Disciplinary Procedures Are Flawed By the Lack of Minimal Due Process and By Gender Bias…………………………………14

                1.  Lack of Impartial Tribunal……………………………15

                2.  Rush to Convict; Inadequate Time to Prepare and Consult With Counsel………………………………………………16

       3.   Limited Cross-Examination…………………………………….16

       4.   The Investigator Testified as a Fact Witness...……………17

       5.   Burden of Proof and Presumption of Male Guilt……………17

       6.   Inadequate Written Decision……………………………….18

       7.   Lack of Meaningful Appeal…………………………………18

    ii.   Vassar Did Not Comply With its Own Procedures………………….18

    iii.  Gender Bias Explains the Decision in this Case……………………19

    iv.  There were Disparities in the Treatment of Peter Yu and MCW……21

    v.   Vassar Relies Upon Inapposite Case Law……………………………21

  b.   The Evidence Shows a Severe Penalty Resulting From Anti-Male Gender Bias……………………………………………………………………………22

II.      Peter Yu Has Meritorious State Law Claims……………………………………22

  a.   The Breach of Contract and Breach of the Covenant of Good Faith Claims..22

  b.   The Estoppel and Reliance Claim…………………………………………24

  c.   The New York General Business Law Section 349 Claim…………………24

  d.   The Negligence Claim……………………………………………………25

  e.   The Intentional Infliction of Emotional Distress Claim……………………25

CONCLUSION………………………………………………………………………………25

## TABLE OF AUTHORITIES

**Cases**                                           **Page**

Accord, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)…………………………13

Akins v. Glens Falls City School Dist., 53 N.Y.2d 325, 333 (1981)……………………………18

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)……………………………………13

Becker v. Schwartz, 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 899, 386 N.E.2d 807, 811 (1978)…………………………………………………………………26

Bennett v. U.S. Lines, Inc., 64 F.3d 62, 65 (2d Cir. 1995)………………………………………15

Bleiler v. College of the Holy Cross, 2013 WL 4714340 (D. Mass. 2013)………………16, 22

Boyd v. SUNY Cortland, 2013 NY Slip Op 06751 (3d Dep't 2013)……………………………18

Canpartners Invs. IV, LLC v. Alliance Gaming Corp., 981 F. Supp. 820, 824 (S.D.N.Y. 1997)……………………………………………………………………………13

Celotex Corp. v. Catrett, 477 U.S. 317, 323, (1986)………………………………………13

Corso v. Creighton Univ., 731 F.2d 529, 533 (8th Cir. 1984)…………………………….24

De Angelis v. Lutheran Med. Center, 58 N.Y.2d 1053, 1055 (1986)…………………...…18

Donohue v. Baker, 976 F.Supp. 136 (N.D.N.Y. 1997)……………………………………...17

Dixon v. Alabama, 294 F.2d 150, 157 (5th Cir. 1961)……………………………………...24

Dixon v. Alabama State Bd. of Educ., 294 F2d 150, 159 (1961)...…………………...……18

Doe v. University of the South, 687 F. Supp.2d 744 (E.D. Tenn. 2009)………………….....22

Dr. Bonham's Case, 8 Co.114a, 118a (1610)(Coke, L)...……………………………….17,18

Filner v. Shapiro, 633 F.2d 139, 143 (2d Cir. 1980)……………………………....................25

Gally v. Columbia University, 22 F.Supp.2d 199 (S.D.N.Y. 199)………………………….23

Green Party v. N.Y. State Bd. of Elections, 389 F.3d 411 (2d Cir. 2004)…………....………6

Interlink Int'l Fin. Servs., Inc., v. Block, 145 F. Supp. 2d 312 (S.D.N.Y. 2001)…………...…23

Int'l Bhd. of Teamsters v. Local Union No. 810, 19 F.3d 786, 789 (2d Cir. 1994)………..…6

Jackson v. Jackson, 962 F.Supp. 391 (S.D.N.Y. 1997)……………………………………..6

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)………….…7

Johnson Controls, Inc., v. A.P.T. Critical Systems, Inc., 323 F. Supp. 2d 525, 531
(S.D.N.Y. 2004)……………………………………………………………………….....6,23

Jones v. City of New York, 12-CV-1739, 2013 WL 6814796 (E.D.N.Y. 2013)……………16

Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993)……....…………………………….25

Lilly v. Virginia, 527 U.S. 116, 124 (1999)……………………………………………….16

Maas v. Cornell University, 94 N.Y.2d 87, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999)………..23

Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008)………..14

Mallory v. Ohio University, 76 F. App'x 634 (6th Cir. 2003)………………………………..21

Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980)…………………………………………15

Matter of Kalinsky v. State Univ. of N.Y. at Binghamton, 161 AD2d at 1007………………..10

Matter of Rauer v. State Univ. of N.Y., Univ. at Albany, 159 A.D.2d 835, 836 1990…..........10

Matter of Schwarzmueller v. State Univ. of N.Y. at Potsdam,
105 A.D.3d 1117, 1119 (3d Dep't 2013)……………………………………....……..10

McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)…………….....…………………..18

Mikinberg v. Baltic S.S. Co., 988 F.2d 327, 331 (2d Cir. 1993)…………………..……….15

Money Group, Inc. v. Highfields Capital Management, 368 F.3d 138, 143 (2d Cir. 2004)…......19

Mostaghim v. Fashion Institute of Technology, 2002 WL 1339098 (S.D.N.Y. 2002)…………24

Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,
85 N.Y.2d 20, 25, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995)…………………………………25

Petrelli v. City of Mount Vernon, 9 F.3d 250, 256 (2d Cir. 1993)…………….....……………24

Pucino v. Verizon Wireless Communications Inc., 618 F.3d 112, 117 (2d Cir. 2010)…………13

Pulka v. Edelman, 40 N.Y.2d 781, 782-784 (1976)……………..…………………………………18

Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)…………………………13

Roso-Lino Beverage Distributors, Inc. v. The Coca-Cola Bottling Co. of N.Y., Inc.,
749 F.2d 124 (2d Cir. 1984)……………………………………………………..…………19

Scott v. WorldStarHiphop, Inc., 2011 U.S. Dist. 123273 (S.D.N.Y. 2011)…………………..22

Small v. Lorillard Tobacco Co., 94 N.Y.2d 43, 55, 720 N.E.2d 892,
698 N.Y.S.2d 615 (1999)……………………………………………………………....…14

Stariveshevsky v. Hofstra University, 161 Misc.2d 137, 612 N.Y.S.2d 754 (Sup.Ct, Suffolk Co. 1994)………….15

Time Warner Cable of N.Y. City v. Bloomberg L.P., 118 F.3d 917, 923
(2d Cir. 1997)………………………………………………………………..………….6

Tumey v. Ohio, 273 U.S. 510, 534 (1927). ………………………......………………..…………17,18

Turcotte v. Fell, 68 N.Y.2d 432, 437 (1986)……………………………………………………18

United States v. All Funds Distributed to Weiss, 345 F.3d 45 (2d Cir. 2003)…………………..13

United States v. Collado, 348 F.3d 323, 327 (2d Cir. 2003)…………………………………13

Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)………….13

Wilner v. Allstate Insurance Company, 2010 NY Slip Op 248; 893 N.Y.S.2d 208 (2d Dep't 2010)..................................................................................................25

Yusuf v. Vassar College, 35 F.3d 709, 714, 715 (2d Cir. 1994)…….....................14, 20, 22

**Statutes & Rules**

Title IX of the Education Amendments of 1972…………………………….…....*passim*

Family Educational Rights and Privacy Act, codified at 20 U.S.C. § 1232g ……….....…. *passim*

Federal Rule of Civil Procedure 56(c)………………………………………………....13

20 U.S.C. § 1681(a)…………………………………………………………......…14

28 U.S.C. § 2201……………………………………………………………….8

20 U.S.C.A. §§ 1232g(b)(1)(A)-(L); (b)(3), (b)(6)(A); (b)(6)(B) …...…………………….21

20 U.S.C.A. §§ 1232g(a)(2) ………………………………………………...…21

34 CFR § 99.31…………………………………………………………….21

34 CFR § 106.8………………………………………………………………14

Restatement (Second) of Contracts § 205 (1981)……………………………………...13

General Business Law § 349(a)…………………………………………….......14, 15

Prosser and Keeton, Torts § 30 at 164-65 (5th ed 1984)…………………………......…18

Prosser and Keeton, Torts § 53 (5th ed)…………………………………………….18

Restatement (Second) of Torts § 314A…………………………………………......18

The Restatement (Third) of Torts: Liability for Physical Harm § 40…………………………26

H. Bader, "Suing Over Star Chamber Hearings," *Minding The Campus.com* (Aug. 27, 2013) "Dear Colleague Letter" H. Bader, "Education Department Illegally Ordered Colleges To Reduce Due-Process Standards," *Examiner.com* (Sept. 21, 2012). (pg. 18)………………………………………17,18

## PRELIMINARY STATEMENT

On February 18, **2012**, Plaintiff Xiaolu "Peter" Yu ("Yu"), then a Vassar College freshman, and Mary Claire Walker ("MCW"), then a Vassar College sophomore, attended a party where members of the Vassar College crew team were drinking. After spending the remainder of the evening together kissing and flirting, MCW agreed to have sex with Yu in his dormitory room. There, the older MCW, who was not a sexual virgin, took her own clothes off and had consensual sex with the younger Peter Yu, who prior to that night had been a sexual virgin. Afterward, MCW did not seek medical attention and did not file a police report; instead, **MCW and Yu exchanged Facebook messages in which MCW apologized for leading Peter on and saying "I had a wonderful time last night. . . ."**

In early 2013, MCW received "counselling" from Vassar College sexual assault advisors; and on February 18, **2013**, MCW made a complaint alleging sexual misconduct against Yu based on what had happened **one year earlier**. Richard Horowitz, who had been Vassar College's Title IX investigator for nine months, purportedly did an investigation, but questioned witnesses in a way to illicit their opinions of MCW's purported "intoxication" without ever establishing any context or witness competency therefor. On March 4, 2013, Yu was given access to the investigation file for the first time.

On March 7, 2013, a Star Chamber "hearing" was held on the charge of sexual misconduct. The hearing panel consisted of four faculty members despite Yu's request for a student on the panel and despite MCW being the daughter of a Vassar College faculty member. Yu had to act as his own lawyer. Only <u>unsworn</u> "testimony" was given by MCW and the student witnesses. The hearing panel took such unsworn testimony at face value as a matter of practice, thus effectively negating any burden of proof, and also relied on the flawed investigator's report. Right after the hearing, the three voting members of the panel found Yu guilty of sexual misconduct and ruled he should be expelled. The next day, March 8, 2013, only nine days after first being informed of the sexual misconduct charge, Yu was expelled, putting a disabling black mark on his record.

1

Yu submits this Memorandum of Law in opposition to Vassar's motion for summary judgment. The motion should be denied. There are genuine issues of material fact, and Vassar College is not entitled to judgment as a matter of law under Title IX or state law. Anti-male gender bias accounts for what was an erroneous outcome from a very flawed proceeding that ended in a severe penalty.

## STATEMENT OF THE CASE

### A. The Night Of February 18, 2012.

On the night of February 18, 2012, the Vassar College crew team held a party where Yu was to meet Sara Cooley (Student B), who he had been previously intimate with, but instead met with MCW and consumed alcoholic beverages with her. (Yu Decl. ¶ 3.) The two left the party and went to "The Mug," a place frequented by Vassar students, where the two talked, drank more, kissed, kept on kissing and agreed to have sex; and to do so, after finding out that MCW's dorm room was not available, they went to Yu's dorm room. (Yu Decl. ¶¶ 4-5.) There, the older MCW, who was not a sexual virgin and who had been in an intimate relationship that had recently broken up, took her own clothes off in order to have sex with the younger Yu, who prior to that night had been a sexual virgin. (Yu Decl. ¶¶ 9-10.) Consensual sexual intercourse ensued. (Yu Decl. ¶ 11.) It is undisputed that afterward, MCW left Peter's dorm room and did not seek medical attention and did not file a police report. Instead, the next day, when MCW and Yu were in their respective dorm rooms, they exchanged Facebook messages in which MCW apologized for leading Yu on and saying "I [MCW] had a wonderful time last night. . . ." MCW and Yu also discussed the apparent fact that Security was called on Peter because, as Peter wrote, some students "thought I [Peter] might be potentially hurting somebody," to which MCW wrote back "I [MCW] will stand up for you [Peter] because you [Peter] were not." Yu wrote that Security being called was "just" his student dorm fellow "overreacting." (Yu Decl. ¶¶ 2- 15 & Ex. Yu Ex. A.)

Two other female members of the Vassar crew team, Carolina Gustafson and Sara Cooley, did go to Yu's dorm room. Ms. Cooley had, in the past, been in an intimate relationship with Yu (Yu Decl. ¶ 3) and had a motive to interrupt MCW from starting an intimate relationship with Yu.

**B. February 19, 2012 To February 18, 2013: A Year Passes.**

MCW and Yu continued to exchange Facebook messages for the next nine months. On March 20, 2012, MCW wrote to Yu apologizing "for that night," that it "was very irresponsible of me [MCW] to get drunk and do that with you [Peter]," that "I [MCW] did not treat you [Peter] very well, and it was disrespectful on my [MCW's] part to do what I [MCW] did because I [MCW] was drunk." Yu replied with "thanks for the concern" but assured her that he was OK and asked why the message. MCW responded that she felt guilty "and hadn't said I was sorry. . . ." Messages were exchanged in May and October 2012 about crew team needs and exams. (Yu Decl. ¶ 15 & Ex. A.)

The next year, in [early 2013,] MCW consulted with a combination of advisors from the Sexual Assault Response Team ("SART"), the Sexual Assault Prevention Program ("SAVP") and her coach, Stephanie Ricker, about what had happened on the night of February 18, 2012 with Yu. (Schrock Dep. Exs. 2-5, 8-10)

**C. February 18, 2013 To February 26, 2013: The Complaint and Investigation**

On February 18, 2013, MCW filed a statement with SART that she had been allegedly sexually assaulted by Yu when she was so intoxicated as to be incapable of consent. (Brown Aff. Ex. A.) That same day, an investigation was begun by Vassar's Title IX investigator Richard Horowitz and Vassar's Associate Director of Security Kim Squillace. (Horowitz Aff. Ex. B.) Richard Horowitz had been Vassar College's Title IX investigator for nine months; he could not remember any training he received. (Horowitz De. 7:11-25, 36:20-37:8.) On February 19, 2013, Yu was told, out of the blue and without explanation, that he was banned from the college crew team. (Yu Decl. ¶ 17.)

3

The Horowitz investigation involved interviews with MCW, Yu and three other students. Yu supplied the Facebook messages that Horowitz (at his deposition) recognized undermined MCW's statement (Horowitz Dep. 269:20-270:23); but no attempt was made to assess the credibility of witnesses or investigate into biases or relationships. (Horowitz Dep. 230:2-231:23, 251:22-252:5, 274:25-276:16; Yu Decl. ¶ 18 & Ex. A.) Horowitz relied on the student witnesses for an assessment of MCW's intoxication, but did not investigate the competency of Sara Cooley to make an assessment of MCW's intoxication or the Student Fellow's competency to make an assessment of Yu's supposed lack of intoxication. (Horowitz 180: 11-21, 236:5-15.) Horowitz never makes a focus of an investigation the intoxication of a male student. (Horowitz Dep. 258:10-15.)

Eight days after the investigation began, on February 26, 2013, Horowitz reported to the Dean of Students David Brown that based on statements by MCW and other students, Yu may have committed sexual misconduct in violation of Section 5.05 and Section 20.2 of Vassar's College Regulations. Horowitz then prepared a written report of the investigation. (Horowitz Aff. Ex. F.) Horowitz did not include the point in his report that MCW's Facebook messages undermined MCW's statement, but instead treated the evening as a matter of MCW being drunk, Yu taking advantage of MCW, and some other students being concerned about MCW. (Horowitz Aff. Ex. F.)

Section 5.05 of Vassar's College Regulations states:

5.05 Sexual Misconduct offenses include but are not limited to, non-consensual sexual contact (or attempts to commit same), non-consensual sexual intercourse (or attempts to commit same), and sexual exploitation.
▪ Non-consensual sexual intercourse is any sexual intercourse, however, slight, or with any object, by a person upon a person, that is without consent and/or force.

(Brown Aff. Ex. E at VAS 00000153.) Section 20.2 of Vassar's College Regulations repeats the definition of non-consensual sexual intercourse. (Brown Aff. Ex. E at VAS 00000159.) In another part of Vassar's College Regulations that would not be cited in Dean Brown's letter charging Yu, it is stated: "Consent cannot be gained by force, coercion, by ignoring or acting without regard to the

4

objections of another, or by taking advantage of the incapacitation of another, where the accused knows or should have reasonably known of such incapacitation." (Brown Aff. Ex. E at VAS 00000140; Bogl. Decl. Ex. C at 00016, 00019.)

### D. February 27, 2013 To March 4, 2013: Charges and File Disclosure To Yu.

The next day, on February 27, 2013, Dean Brown informed Yu in a letter that a hearing would be held on March 7, 2013, before Vassar's "Interpersonal Violence Panel," to determine whether Yu had violated Section 5.05 and Section 20.2 of Vassar's College Regulations by engaging in sexual misconduct. Dean Brown, with his letter, enclosed a copy of Sections 5.05 and Section 20.2 of Vassar's College Regulations. (Yu Dep. 171:21-172:13; Bogl. Decl. Ex. C at 00016, 00019.) Yu was shocked by the false charge of sexual misconduct, and no one ever explained the rights that Yu had. (Yu Decl. ¶¶ 19-20.)

The hearing date, March 7, 2013, was nine days away and in the middle of midterm exams. Yu's request for an adjournment was denied; in contrast, Vassar clearly indicated that it would accommodate MCW's request for adjournment because of midterms without question. (Yu Decl. ¶ 26; Yu Decl. Exs. E and F.)

Yu then provided names of two witnesses who had not been previously contacted by investigators: the roommates of Yu and MCW; however, they were not called as witnesses and Horowitz was reluctant to contact them. (Yu Decl. ¶ 23 & Ex. D.). According to Horowitz, it so happened that neither roommate was able to attend the hearing, Yu's roommate was said by Horowitz to recall that he was asked by Yu to leave the room the night of February 18, 2012 and MCW's roommate was said by Horowitz that she could not recall a year old phone call. (Horowitz Aff. Exs. H-J.) Yu's roommate Simon Patane testified, however, that Horowitz made no real effort to get Patane's appearance at the hearing and argued with Patane that Yu was not drunk. (Patane Dep. 20:11-21:7, 32:21-33:13.) Additionally, Horowitz failed to make a material investigation into possible witnesses at

The Mug, which was clearly identified as an important part of the evening by MCW and Yu. (Horowitz Dep. 260:25-261:12.)

On March 4, 2013, only three days before the scheduled hearing, Yu was given access to the investigation file for the very first time; the investigation file contained Dean Brown's letter to Yu notifying him of the charge, the Horowitz investigation report, witness statements, Yu's statement, the Facebook messages, the names of the witnesses who would be called at the hearing and the names of the panel members. (Yu Decl. ¶¶ 23-24; Yu Dep. 80:8-22; Yu P.I. Decl. ¶¶ 8-9.)

### E. **March 7, 2013: The Rushed Star Chamber Hearing.**

On March 7, 2013, the hearing was held, only eight days after Yu was first told of the sexual misconduct charge. (Roellke Aff. ¶ 6; Yu Decl. ¶ 28.)

#### 1. **The All Faculty Hearing Panel.**

The hearing panel consisted of a non-voting chair and three voting members, all four of whom were faculty members. Luis Inoa, an Assistant Dean, was the non-voting chair. The voting panel members were: Jane Parker, a Physical Education Lecturer, Sophia Harvey, Associate Professor of Film; and Jamie Kelly, an Assistant Professor of Philosophy. (Iona Aff. ¶ 2; Parker Aff. ¶ 2; Kelly Aff. ¶ 2; Yu Decl. ¶ 28.) Yu had requested that there be a student member of the hearing panel, but MCW's request for an all faculty member panel was honored despite the well-known fact that MCW's father was a Vassar College faculty member. No conflict of interest check was apparently run as to the faculty panel members, investigator or witnesses. (Yu Decl. ¶ 21.;Harvey Dep. 38:9-14; Horowitz Dep. 235:4-14.)

While the panel members supposedly received training to serve on Vassar's "Interpersonal Violence Panel," in fact there was minimal actual training, and when deposed, the panel members could remember little that was learned in training sessions. It was recalled that the training did not allow the panel members to consider the intoxication of the male student as rendering him incapable of

consent, and did not include asking about whether a complainant sought medical assistance or filed a police report after an incident. (Inoa Dep. 45:11-46:8; Parker Dep. 56:15- 57:19; 93:9-16; 93:19-21; Harvey Dep. 123:19-124:14; 127:16-128:11; Yu Decl. ¶ 33.)

## 2. The Hearing "Evidence."

At the hearing, Yu could not ask questions himself, but rather had to submit his list of questions to panel chair Inoa, who would decide whether or not to ask Yu's questions. Yu did submit a list of questions to be addressed to MCW, the student witnesses and Horowitz; however, panel chair Iona did not ask many of those questions and allowed MCW to be non-responsive with crying and non-responsive answers. (Yu Decl. ¶ 30.)

The live witnesses did not give sworn testimony, but unsworn accounts. The live witnesses were: MCW; Yu; Title IX investigator Richard Horowitz; female student A (Carolina Gustafson); female student B (Sara Cooley); and a student dorm resident fellow (Zachary Hays). (Yu Dep. 170:12-18; Yu Decl. 29.)

MCW's unsworn account, which was entirely inconsistent with her Facebook messages to Yu and with her not filing a police report and not seeking medical attention, was: that on February 18, 2012, MCW and Yu attended a party where she became increasingly intoxicated; that she could not remember details because of her intoxication; but that she did remember rebuffing Yu's attempts to kiss her but then ending up (by magic?) in Yu's dorm room where Yu removed MCW's clothes, used physical force to force her to perform oral sex on him and then had sexual intercourse with her despite her attempts to push him away, after which MCW put on her clothes and left. (Horowiz Aff. Exs. A, C, F; Roellke Aff. Ex. A at 00001314.)

Yu's account, which is sworn to in this action, was: that on February 18, 2012, MCW and Yu met at the crew team party where both MCW and Yu were drinking and where Yu learned that MCW had broken up with her boyfriend; that MCW and Yu left that party and went together to "The Mug,"

7

and continued to flirt and kiss; that during the walk over to The Mug, MCW placed her arm around Yu's shoulders as a sign of intimacy, not for support; and as the night continued on, Yu and MCW continued to kiss and then decided to have sex; that figuring out where to go, MCW phoned her roommate to inquire about the "availability" of her dorm room but was unable to reach her roommate, so they decided to go back to Yu's dorm room instead; that as they walked from The Mug to Jewett Building in which Yu's dorm was located, MCW again placed her arms around Yu; that upon reaching Yu's dormitory, they took the stairs to Yu's room on the fourth floor; that after Yu and MCW used the bathroom, they met at Yu's dorm room; that Yu informed MCW that it would be "his first time" and she responded, "it's okay, I know what to do"; that MCW took off her clothes and Yu did the same with his clothes; that they kissed and MCW on her own performed oral sex on Yu, stating, "I know how to do this, I have done this before"; that MCW then, using her hand and her teeth, ripped open the condom packet next to the bed and placed the condom on Yu; that Yu began performing oral sex on MCW while she instructed him on where and how to do so; that Yu and MCW then engaged in sexual intercourse and kissed while doing so; that at one point, MCW and changed positions and MCW got on top of Yu; that they were interrupted by Yu's roommate starting to enter the room and Yu asked him to leave; that following the interruption, Yu and Ms. Walker did not resume sexual intercourse; that MCW began to lament about her ex-boyfriend and stated that she was not ready to jump into anything new; that the two got dressed, with MCW commenting on "taking Yu's virginity"; that shortly after MCW left the dorm room, Yu's Resident Advisor called Yu out in the hallway to question him about his "party habits"; and that Yu communicated with MCW the next day on Facebook. (Yu Decl. ¶¶ 2-14.)

The Facebook messages were put before the hearing panel, showing that the day after the sexual encounter, Yu and MCW were communicating on Facebook, with MCW apologizing for leading Peter on and saying "I [MCW] had a wonderful time last night. . . ." Also at that time on

Facebook, MCW and Yu discussed the apparent fact that Security was called on Yu because, wrote Peter, some students "thought I [Peter] might be potentially hurting somebody," to which MCW wrote back "I [MCW] will stand up for you [Peter] because you [Peter] were not." Yu wrote that Security being called was "just" his student dorm fellow "overreacting." (Yu Decl. ¶ 13, 30 & Ex. A.)

Title IX investigator Richard Horowitz discussed his investigation report discussing the case as if he were a percipient fact witness that he was not. Horowitz said his investigation found that, based on the account of MCW and other students, that Yu had sexual intercourse with MCW while she was intoxicated and unable to consent. (Horowitz Aff. Exs. A, C, F; Roellke Aff. Ex. A at 00001314-18.) Horowitz admitted in his deposition that the Facebook messages conflicted with MCW's account, that he did not mention those Facebook messages in his report and that he did not consider Yu's ability to consent given his inebriation. (Horowitz Dep. 269:20-270:23.) Horowitz also admitted in his deposition that drinking a lot did not mean one was incapacitated. (Horowitz Dep. 180:11-21.)

The unsworn accounts of female Students A and B were that they were concerned about MCW's state of inebriation and had gone to Yu's dorm room, spoke to the student resident dorm fellow (who called Yu out of his dorm room), and learned that MCW was not there. (Horowitz Aff. Exs. A, F; Roellke Aff. Ex. A at 00001324.)

The unsworn account of the student resident dorm fellow was that Yu did not appear drunk to him (Roellke Aff. Ex. A at 00001324) -- contrary to not just Yu's account but to Yu's Facebook messages to MCW of February 19, 2012. (Yu Decl.¶¶ 2-14 & Ex. A.) Horowitz in his deposition admitted that he did not investigate the competency of the Student Fellow to opine about Yu's intoxication. (Horowitz Dep. 256:21-258:5.)

### 3. **The Hearing Decision.**

Immediately following the taking of the unsworn live statements, the panel voted to find Yu guilty (Iona Aff. ¶ 2; Parker Aff. ¶ 2; Kelly Aff. ¶ 2); and Yu was so informed in the hearing room (Yu

Dep. 176:11-17; Bogan Decl. Ex. C at 00026). The panel's "written decision" consisted of a 1¼ page document on which handwritten notes were made stating that Yu was responsible for violating Sections 5.05 and 20.2 of the College Regulations and that expulsion was the sanction as being "best for the college community." Information "considered in reaching a decision" were "three 3 witnesses," "Investigator finding," "Complainant testimony" and "Respondent testimony." As for "information NOT considered in reaching a decision," written but then marked out was "Facebook chat because it occurred after the in...." (Inoa Aff. Ex. A.) Panel members have stated in their testimony that they did consider the Facebook messages, but they do not explain how they square those Facebook messages with finding Yu guilty. (Iona Aff. ¶ 6, Inoa Dep. 95:15-100:14; Kelly Aff. ¶ 6; Harvey Dep. 105:7-106:4, 123:19-124:14.) Yu was not given a copy of the written decision, transcript or audio recording. (Yu Decl. ¶¶ 38-39.)

## F. **March 8, 2013: Yu's Expulsion From Vassar College.**

On March 8, 2013, the day after the hearing decision and only ten days after Yu had first been informed of the charge of sexual misconduct, Dean Brown informed Yu that he had been expelled from Vassar College. (Yu Decl. ¶ 35; Yu Dep. 171:21-172: 13, 173:14-174:12, 176:18-177:15; Brown Aff. Ex. D.) Yu was shocked by the expulsion. (Yu Decl. ¶ 36.)

The Vassar Student Conduct Sanctioning Parameters state that for violations of Section 5.05 of Vassar's College Regulations, the sanction may range from probation to expulsion and that for violations of Section 20.2 of Vassar's College Regulations, sanction may range from suspension to expulsion. (You Decl. ¶ 37 & Ex. K; Brown Aff. Ex B.) The Interpersonal Violence Panel Rules and Procedures state that character statements and impact statements will be taken into consideration when the panel considers the severity of the sanctions; and the Vassar College Regulations 2012/2013 consider the "precedents in similar cases" and "student's disciplinary record." (Yu Decl. ¶ 37 & Exs. L, M p. 135.) Accordingly, Yu submitted three character statements written on his behalf and an

10

impact statement. (Yu Decl. ¶ 37 & Exs. N-O.) Yu had no prior history of sexual misconduct on his disciplinary record, and the panel was provided a precedent of another student found "responsible" of the same charges, Section 5.05 and 20.02, and only received suspension for one term. (Yu Decl. ¶ 37 & Ex. P.) Yet, Yu received the highest sanction possible pursuant to Vassar's sanctioning parameters. (Yu Decl. ¶ 37 & Ex. I.) The panel members could not explain why the penalty was severe in Yu's case. (Inoa Dep. 131:8-12; Harvey Dep. 149:22-153:3.)

## G. The "Appeal."

Yu appealed his expulsion to the College Regulations Appeal Committee. (Yu Dep. 174:25-175:7: Roellke Aff. Ex. C.) The appeal panel consisted of two voting faculty members and the Dean of the College serving as a non-voting chair. (Brown Aff. Ex. E at 00000188.) While Vassar gives assurances about a full record being provided to the appeal panel, the tape of the hearing was inaudible (see Leonard Decl.), there is no complete transcript and the "written decision" provided no detail; and Yu was not provided with what transcript there was and did not receive the written decision. (Yu Decl. ¶¶ 38-40.) In fact, notes taken by the panelists at the hearing are shredded. (Parker Dep. 42:18-22; Harvey Dep. 70:16-19.) Also, Yu was informed that under Vassar's regulations, the only three grounds for appeal were: (1) procedural error; (2) new evidence; or (3) sanctions disproportionate to the severity of the violation. (Roellke Aff. Ex. B; Brown Aff. Ex. E at 00000189.) Yu's argument on appeal was required to be kept within these limitations, asserting that there were procedural errors and a disproportionate punishment. (Roellke Aff. Ex. C.) MCW and the hearing panel chair submitted statements to the Appeals Committee replying to Yu's appeal. (Roellke Aff. Ex. D; Iona Aff. Ex. B.) On March 27, 2013, nineteen days after Yu's expulsion, the Appeals Committee denied Yu's appeal. (Yu Dep. 177:16-178:3; Roellke Aff. Ex. E.)

## H. The Damage To Yu.

Based on Yu's excellent high school record (Yu Decl. ¶¶ 39-40), he believed he had a bright future ahead of him and was accepted at NYU, Wesleyan, Bates, Carnegie Mellon, Northeastern and Vassar. Yu chose Vassar and paid over $120,000 for the 2012/2013 academic year, which included the costs of tuition, room and board, activities fee, health insurance fee and school supplies. (Yu Decl. ¶ 45.) Vassar has retained all those monies. (Yu Decl. ¶ 52.)

Following expulsion from Vassar in March 2013, Yu filed eleven applications to other educational institutions, and two other educational institutions advised Yu not even to bother applying given the circumstances of his departure from Vassar. (Yu Decl. ¶ 50.) As part of that application process, Yu had to sign a waiver so that he could allow those educational institutions access to his education file at Vassar, and Vassar released the whole file including the portion relating to the accusations of sexual misconduct by MCW. As a result, nine of the eleven institutions rejected Yu, including three that had accepted him in 2012, with many of those colleges expressly referring to the expulsion for sexual misconduct as the reason. (Yu Decl. ¶ 48 & Ex. C.) Yu is presently attending another university, but not one of the same caliber as Vassar, which will impact his future employment prospects. (Yu Dep. 125:16-19, 130:3-5; Yu Decl. ¶¶ 51, 53.) Yu was recently prevented from applying for study to educational institutions abroad due to his tainted record. (Yu Decl. ¶¶ 51, 53.)

## I. Yu's Federal Court Complaint and Litigation.

On June 25, 2013, Yu filed his Complaint alleging Title IX gender discrimination and state law claims. (SDNY ECF Doc.1.) The Complaint truthfully states the facts: that are supported by Yu's sworn testimony, that show anti-male gender bias accounting for what was an erroneous outcome from a very flawed proceeding that ended in a severe penalty and that form the basis of Yu's legal claims. Vassar notes the publicity as to this case, but this case is not unique in that regard. The subject of how colleges treat or mistreat accusations of sexual misconduct is very much in the news today, as conflicting views are presented by the Obama Administration pressing for action by universities, *see*

"U.S. Lists Colleges Under Inquiry Over Sex-Assault Cases," *New York Times* (May 1, 2014), and conservative commentators critical of universities in their handling of such accusations, *see* Editorial, "The White House Flunks A Test On Sexual Assault," *Wall Street Journal* (May 6, 2014); T. Sowell, "Sexual Assault on Campus," *National Review Online* (May 13, 2014) (the criminal legal system should deal with sexual assault, not universities); T. Sowell, "Kangaroo Courts on Campus," *Front Page Magazine* (May 13, 2014)(denouncing university kangaroo courts).

This summary judgment motion is being briefed while depositions of Vassar people have been conducted this week, including the day before the filing of this Memorandum of Law.

## SUMMARY JUDGMENT PRINCIPLES

A federal court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. at 323.

According to the Second Circuit in *United States v. Collado*, 348 F.3d 323, 327 (2d Cir. 2003), "[t]he evidentiary standard that must be met [by a moving party] is a high one, since a court is obliged 'to draw all inferences in favor of the party against whom summary judgment is sought,' *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989), and to 'construe the evidence in the light most favorable to the nonmoving party.' *United States v. All Funds Distributed to Weiss*, 345 F.3d 45 (2d Cir. 2003)." *Accord*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Vermont Teddy Bear*

*Co. v. 1-800 Beargram Co,*, 373 F.3d 241, 244 (2d Cir. 2004); *Pucino v. Verizon Wireless Communications Inc.*, 618 F.3d 112, 117 (2d Cir. 2010).  Once a moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must proffer admissible evidence that sets forth specific facts showing genuine issues of material fact under applicable legal principles. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

## ARGUMENT

### I.  YU HAS A MERITORIOUS TITLE IX CLAIM.

Summary judgment should be denied on Yu's Title IX claim because evidence shows that Vassar discriminated against him based on his gender when Vassar charged, Star Chambered and found Yu guilty of sexual misconduct and expelled him.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX is enforceable by an implied private right of action for monetary damages and injunctive relief. *Yusuf v. Vassar College*, 35 F.3d 709, 714 (2d Cir. 1994). There are two categories of Title IX claims: (1) an erroneous outcome from a flawed proceeding; and (2) selective enforcement. *Yousuf v. Vassar College*, 35 F.3d at 715.  Here: (A) there was an erroneous outcome from a very flawed proceeding that resulted from anti-male gender bias; and (B) there was a severe penalty explainable only by Yu's male gender.

#### A.  The Evidence Shows An Erroneous Outcome From A Flawed Proceeding That Resulted From Anti-Male Gender Bias.

The Statement of the Case presented above (pp. 3- 13) shows that the record evidence supports finding an erroneous outcome from a flawed proceeding that resulted from anti-male gender bias. Vassar's contrary argument rests on five unsupportable points.

##### 1.  Vassar's Disciplinary Procedures Are Flawed By The Lack Of Minimal Due Process and By Gender Bias.

Vassar first argues that Yu cannot show that Vassar's disciplinary procedures are flawed. Vassar cites to (i) a Department of Education regulation, 34 C.F.R. § 106.8, requiring all higher educational institutions to designate an employee responsible for compliance with the responsibilities imposed by non-discrimination on the basis of sex and to establish a grievance procedure for complaints; and (ii) a Department of Education "Dear Colleague Letter" dated April 4, 2011, that reiterates the requirements of 34 C.F.R. § 106.8 and that calls for impartial investigations, reasonable time frames and notice of outcome. (Df Mem. 11-12.) Vassar says it is in compliance with these base requirements, but Vassar is not facing up to the defects of its procedures and their implementation.

Title IX requires that all higher educational institutions to have policies and procedures for sexual misconduct cases that accord "due process to both parties involved." 66 Fed. Reg. 5512 at 22; see *Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987). Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature. *Stariveshevsky v. Hofstra University*, 161 Misc.2d 137, 612 N.Y.S.2d 754 (Sup.Ct, Suffolk Co. 1994). The Second Circuit has recognized that "evidentiary weaknesses" and "procedural flaws" may support a case of an erroneous outcome reached by a flawed procedure. *Yusuf v. Vassar College*, 35 F.3d at 715. There were numerous procedural flaws here denying a <u>minimal</u> due process required for fairness.

      **(a)**    **<u>Lack of Impartial Tribunal.</u>** An impartial and disinterested tribunal is a basic requirement of due process serving to preserve both the appearance and reality of fairness and to help prevent takings on the basis of an erroneous or distorted conception of the facts or the law. *Marshall v. Jerrico. Inc.*, 446 U.S. 238, 242 (1980); *In re Murchison*, 349 US. 133, 136 (1955). Indeed, an impartial tribunal was called the most important element in a fair hearing by esteemed Second Circuit Court of Appeals Judge Henry J. Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267 (1975), *cited in Matthews v. Eldridge*, 424 U.S. 319 (1976). Here, the panel consisted of all faculty members when MCW's father was and is a Vassar faulty member. That Vassar's regulations allowed this

situation at MCW's request does not answer the objection. MCW was not entitled to a partial tribunal, which is what the panel showed themselves to be when, among other things, the Facebook messages that undermined MCW's story were rationalized away and Yu was not allowed to have an effective cross-examination.

**(b)** **Rush To Convict; Inadequate Time To Prepare and Consult With Counsel.**

Even the "Dear Colleague Letter" refers to "reasonable time frames," and students in a disciplinary case do have a right to consult with counsel, *Osteen v. Henley*, 13 F.3d 21, 225 (7th Cir. 1993), *Johnson v. Temple University*, 2103 U.S.. Dist. 134640 at 26*, 2013 WL 5298484 at 10* (E.D. Pa. Sept. 19, 2013). Here, there were only eight days from the day (February 27, 2013) that Yu was given notice of the sexual misconduct charge for the first time to the day (March 8, 2013) that the hearing was held and Yu was found guilty and sanctioned to be expelled. There were only three days from the day (March 4, 2013) that Yu was given access to the investigation file for the first time to the day (March 8, 2013) that the hearing was held and Yu, then a college sophomore, was expected to defend against an accusation based on year-old events. Vassar does not recognize a right to consult with counsel and rushed the proceeding so as to make it practically unavailable.

**(c)** **Limited Cross-Examination.** Cross-examination has been recognized and the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). One case relied upon by Vassar to reject a challenge to university Title IX decisions was one in which the accused student was allowed to ask questions. *Bleiler v. College of Holy Cross*, 2013 WL 4714340 at *3 (D. Mass. Aug. 26, 2013). Here, the panel chair Luis Inoa decided what questions could be asked at the hearing of MCW, and he (the panel chair) was the one who asked the questions. (Inoa Dep. 86:13-18; 146:16-21.) Yu had a list of questions of MCW, the students and Title IX investigator Horowitz concerning, for example, the inconsistency between had

MCW's account and the Facebook messages. But panel chair Inoa refused to ask many of those questions and allowed MCW to be non-responsive with crying and non-responsive answers. (Yu Decl. ¶ 30.)

**(d)** <u>**The Investigator Testified As A Fact Witness.**</u> Another basic requirement of due process of old lineage is keeping the roles of prosecutor, witness and judge separate. _Tumey v. State of Ohio_, 273 U.S. 510, 534 (1927)("A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law ...."); _Dr. Bonham's Case_, 8 Co.114a, 118a (1610)(Coke, L). Title IX investigator Horowitz testified as if he were a fact witness with personal knowledge, which Horowitz did not have. Horowitz's statement gave an official imprimatur on finding the accused guilty based on a treatment of the facts not based on percipient knowledge and reflecting a biased investigation.

**(e)** <u>**Burden of Proof, Presumption of Male Guilt and No Sworn Testimony.**</u> It may be argued about what the burden of proof should be for Title IX cases. _Compare_ "Dear Colleague Letter" _with_ H. Bader, "Education Department Illegally Ordered Colleges To Reduce Due-Process Standards," _Examiner.com_ (Sept. 21, 2012). But having a burden of proof is a well-established basic constitutional requirement. _Tumey v. Ohio_, 273 U.S. 510 (1927). Here, hearing statements were not sworn, and panel members took the accusatory testimony of MCW, Students A and B and the Student Fellow at face value, effectively using a presumption of male guilt that negated having even a preponderance of the evidence burden of proof. That subject of Vassar's presuming male guilt has been recognized and is the subject of commentary. H. Bader, "Suing Over Star Chamber Hearings," _Minding The Campus.com_ (Aug. 27, 2013). Among other things, Vassar's President has recognized that when two students are drunk, only the female is considered incapable of giving consent (Lau Decl. Ex. 8); and as discussed below, gender bias explains the decision.

**(f)** **Inadequate Written Decision.** The failure to set forth a detailed factual finding in the college's disciplinary determination is another basic failure of due process. _Boyd v. SUNY Cortland_, 2013 NY Slip Op 06751 (3d Dep't 2013) ("In a disciplinary proceeding at a public institution of higher education, due process entitles a student accused of misconduct to 'a statement detailing the factual findings and the evidence relied upon by the decision-maker in reaching the determination of guilt'.") A college's failure to provide a detailed factual finding forecloses the accused student's ability to "effectively challenge the determination in administrative appeals and in the courts and to ensure that the decision was based on evidence in the record." _Dixon v Alabama State Bd. of Educ._, 294 F.2d 150, 159 (5th Cir.), _cert. denied_, 368 U.S. 930 (1961). Here, the "written decision" (Iona Ex. A) consists of a few bullet points as to the result and what was considered; no explanation is given. This is inadequate.

**(g)** **Lack of Meaningful Appeal.** Peter Yu was not provided the "written decision" and the transcript, and an appeal is limited in what can be raised. In these circumstances, there was no meaningful right of appeal.

## 2. Vassar Did Not Comply With Its Own Procedures.

Vassar's argument assumes that Vassar did comply with its own Regulations, as inadequate as they were, but there were at least five failures on Vassar's part to do so.

_First_, Vassar College Regulations provide that panelists will have received specialized training with respect to sexual misconduct and harassment (Brown Aff. Ex. E at [pp. 173, 181]); however, here, the panelists testified that they attended only a few hours of sessions and did not remember any of the training except the standard of proof (which they did not apply). (Parker Dep. 25:14-21; 48:22-25; 50:8-13; 76:23-77:23; 56:15- 57:19; Harvey Dep. 12:11-16; 41:2-25.) Compellingly, one panel member, Jane Parker, could not recall much of anything she learned from training, stating "I don't recall" or "I don't remember" nearly 165 times in her deposition. (Parker Dep. _passim_.)

*Second*, Vassar College Regulations provide that the panel decision may be appealed within five days of receiving the written decision (Brown Aff. Ex. at p. 173); however, here, the written decision was never provided to Yu. (Yu Decl. ¶ 39.)

*Third*, Vassar College Regulations and the Vassar Interpersonal Violence Panel Rules and Procedures provide that after a panel determines that a violation has occurred, a sanction shall be recommended in accordance with the nature and seriousness of the offense, the motivation underlying the offense, the impact on the community precedent in similar cases and the student's disciplinary record (Brown Aff. Ex. E at p. 175; Yu Decl. ¶ 37 & Ex. L); however, here, Peter Yu was expelled despite his submitting three character statements on his behalf and his impact statement, his having no prior history of sexual misconduct on his disciplinary record and there being precedent of another student found "responsible" of the same charges, *just 3 months earlier*, Sections 5.05 and 20.2, and only receiving a one-term suspension. (Yu Decl. ¶ 37 & Exs. N-P.)

*Fourth*, Vassar College Regulations provide that that the accused shall have the right to arrange the presence of student, faculty, staff of other relevant witnesses, the right to ask questions of witnesses at the hearing and the right to challenge documentary evidence (Brown Aff. Ex. E at p. 181); however, here, Yu was not given the right to ask questions and the panel chair did not ask many of the questions that Yu had listed (Yu Decl. ¶ 30) and the two student witnesses that Yu asked to make available at the hearing, Title IX investigator Horowitz decided did not need to appear (Yu Decl. ¶ 23).

*Fifth*, Vassar College Regulations provide that the outcome shall be based on evidence that is credible and based in fact (Brown Aff. Ex. E at p. 181); however, here, the Student Fellow was allowed to opine about whether Yu looked drunk (taken at face value) and, as discussed below, MCW's statement had obvious credibility problems as discussed next.

### 3. <u>Gender Bias Explains The Decision In This Case.</u>

Vassar argues that there is no evidence that it acted with gender bias toward Yu, asserts that the panel had non-discriminatory reasons for ruling the way it did -- the supposed corroboration of the student witnesses, and rationalizes away the Facebook messages as incriminatory of Yu. (Df Mem. 12-14.) Vassar's argument, however, does not work on summary judgment and would likely be an embarrassing flop with a jury. When the details of the case are considered, gender bias obviously explains the decision in this case. *Yusuf v. Vassar College*, 35 F.3d at 715 (evidentiary weaknesses may support erroneous outcome case). Indeed, in this connection, it should be noted that a pattern of wrongful conduct of discrimination against male students in the context of sexual misconduct allegations was the subject of the leading Second Circuit case, *Yusuf v. Vassar College*, 35 F.3d 709.

Without anti-male gender bias, the accuser MCW's unsworn statement of non-consensual sex simply lacked credibility. One year earlier on the night in question, after the sex with Yu, MCW made no report to the police and did not seek medical attention, but instead exchanged Facebook messages with Yu about how it was she who had led Yu along and how she "had a wonderful time." In fact, Yu and MCW continued to have Facebook communications for eight more months without the slightest hint of an accusation of non-consensual sex. Furthermore, MCW was older than Yu and she was the one with prior sexual experience. MCW's account, which she admitted had limited detail, can hardly explain how non-consensually she managed to get to the fourth floor of a dormitory and to go to the bathroom before going into Yu's dorm room. In stark contrast, Yu's account is fully consistent with the Facebook messages, MCW's lack of a police report, MCW's lack of a doctor's visit, the lack of any accusation of sexual misconduct for a whole year, and the greater sexual experience of the older MCW and contrasting virginity of the younger Yu.

Vassar's strained effort to portray the Facebook messages as incriminatory by showing that Yu knew that MCW was drunk the night in question bizarrely overlooks what the rest of the Facebook messages show: that on the night in question, Yu was drunk as well, MCW thought she had unfairly

led Yu on and MCW "had a wonderful time"; and that for the next eight months, Yu and MCW continued to communicate on Facebook without any hint of a charge of non-consensual sex. The notion that only females are incapacitated from consent by alcohol consumption is by definition gender biased.

The testimony of the other student witnesses did not rehabilitate MCW's statement of non-consensual sex. None of the three were in the room when the sex occurred. For all the supposed concern that Sara Cooley and Carolina Gustafson had for MCW, they were slow enough in getting to Yu's dorm room that MCW had already left, and Sara Cooley had the motive of wanting to interrupt MCW's effort to woo Yu as Sara and Yu had a previous intimate relationship.

### 4. There Were Disparities In The Treatment Of Yu and MCW.

Vassar denies there were disparities in the resources made available to Yu and MCW (Df Mem. 13), but the disparity was plainly evident. MCW had at her disposal a counsellor whose practice was to write sexual misconduct complaints and whose documents reflecting spending serious time with MCW. (Schrock Dep. 68:15-69:4.) Yu received the notice of charges, but no one explained to him his rights and no one advised him of what services were available to him. (Yu Decl. ¶¶ 19-20.)

In addition, disparate treatment was also manifest in the fact that while Yu's request for an adjournment was denied of the hearing given the impending midterm exams; in contrast, MCW's request for adjournment of her taking midterm exams was granted. (Yu Decl. ¶ 27.)

### 5. Vassar Relies Upon Inapposite Case Law.

Vassar cites four cases as supporting Vassar's position. (Df Mem. 14.) These cases, however, are quite inapposite. In _Mallory v. Ohio University_, 76 F. App'x 634 (6th Cir. 2003), the accused student did not testify at the university hearing due to a criminal case that had been promptly brought against him for the complained of behavior, and there was evidence that Ohio University had acted against a female sexual aggressor in a case, dispelling the notion that there was gender bias at work at

that university.  In _Bleiler v. College of the Holy Cross_, 2013 WL 4714340 2013 (D. Mass. Aug. 28, 2013), there was a failure by the accused student to present any evidence at all of erroneous outcome. In _Doe v. University of the South_, 687 F. Supp.2d 744 (E.D. Tenn. 2009), there was no pleading even of how gender bias had resulted in the erroneous outcome; also, the treatment of procedural weaknesses in  _Doe v. University of the South_ may be inconsistent with _Yusuf v. Vassar College_, 35 F.3d at 715 (procedural flaws may support erroneous outcome case).  In _Scott v. WorldStarHiphop, Inc._, 2011 U.S. Dist. 123273 (S.D.N.Y. Oct. 24, 2011), the accused student again failed to allege facts supporting a finding of gender bias.

**B.    The Evidence Shows A Severe Penalty Resulting From Anti-Male Gender Bias.**

The Statement of the Case presented above (pp. 3-13) shows that the record evidence supports finding selective enforcement in a severe penalty resulting from an anti-male gender bias.  Vassar's contrary argument rests on the notion that Yu must show that a female at Vassar in similar circumstances was more favorably treated.  (Df Mem. 15.)  The argument may be called cute: no female at Vassar has ever been charged with sexual misconduct; and in any event, the argument is to no avail because the presumption of male guilt and gender biased decision-making at Vassar results in unduly severe penalties.  In fact, when Yu reported that MCW had made a false complaint against him in violation of Vassar Regulations, p. 116, the panelist weren't aware of it and wouldn't even know how to address it.  (Inoa Dep. 126:2-14; Harvey Dep. 142:18-143:7.)  Notably also, the panel members here could not justify the disregard of the material submitted by Yu as to sanction and could not justify the expulsion of Yu.  (Inoa Dep. 131:8-12; Harvey Dep. 149:22-153:3.)

**II.    PETER YU HAS MERITORIOUS STATE LAW CLAIMS.**

Summary judgment should be denied on Peter Yu's state law claims.

**1.    The Breach of Contract and Breach of the Covenant of Good Faith Claims.**

Vassar argues that as to a breach of contract claim brought by a student based on allegedly improper discipline, judicial review is limited to determining whether the school acted arbitrarily and the school observed its established procedures, citing such cases as _Maas v. Cornell University_, 94 N.Y.2d 87, 721 N.E.2d 966, 699 N.Y.S.2d 716 (1999).  (Df Mem. 15.)  Based on the discussion above under Title IX (pp. 14-22), Vassar did act arbitrarily and did not observe its procedures.

Vassar cites two cases for the proposition that general statements in college handbooks and regulations do not establish a contract (Df Mem. 16), but those cases cannot be so read broadly.  _Gally v. Columbia University_, 22 F.Supp.2d 199 (S.D.N.Y.1998), involved a student's claim that the school's alleged failure to stop cheating on exams was not a breach of contract case.  In _Mostaghim v. Fashion Institute of Technology_, 2002 WL 1339098 (S.D.N.Y. June 19, 2002)(Baer, J.), the contract claims were not rejected because they were grounded on the school's Rights and Responsibilities Manual, but rather the contract claims failed as a matter of the facts.  In contrast precedent support Yu's breach of contract theory. _Dixon v. Alabama_, 294 F.2d 150, 157 (5th Cir. 1961); _Corso v. Creighton Univ._, 731 F.2d 529, 533 (8th Cir. 1984); and on the basis of that precedent, Yu asserts that in exchange for his annual payment in excess of $120,000, Vassar agreed to, among other things, to prohibit discrimination on the basis of, among other things, sex.  (Brown Aff. Ex. E at p. 109.)

Vassar argues that it complied with its own procedures as to discrimination, asserting it was compliant with an all faculty panel and gave adequate notice of charges and procedures.  (Df Mem. 16-17.)  Those issues were, however, minimal due process failures discussed above (pp. 15-18).  Vassar also denies that giving a written decision is an obligation under its rules (Df. Mem. 17), but that requirement is in the Vassar Regulations as a predicate to an appeal and would, in any event, be a minimal due process requirement (p. 18).  Vassar ignores other issues discussed above (pp. 19-20).

Vassar further argues that the failure to consider the Facebook messages and failure to call Peter Yu's witnesses were not failures to conduct appropriate hearings.  (Df Mem. 18-19.)  As

discussed above, Vassar's treatment of the Facebook messages (p. 21) reflects gender bias, and the failure to call Yu's witnesses was a product of Horowitz's biased investigation (pp. 5- 6).

Vassar finally disputes Yu's invoking of the covenant of good faith and fair dealing. (Df Mem. 19.) Under New York law, however, every contract includes an implied covenant of good faith and fair dealing which "precludes each party from engaging in conduct that will deprive the other party of the benefits of the agreement." *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980), *citing Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87-88, 188 N.E. 163, 167 (N.Y. 1933).

## 2. The Estoppel and Reliance Claim.

In New York, the elements of estoppel are a material misrepresentation, reasonable reliance, and provable damages. *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993). Whether equitable estoppel applies presents an issue of fact. *See Petrelli v. City of Mount Vernon*, 9 F.3d 250, 256 (2d Cir. 1993). Vassar argues that it made no material misrepresentations upon which Yu relied and that were necessary for the claim. (Df. Mem. 20-21.) But Vassar made material misrepresentations of fact when it stated that it would not discriminate on the basis of sexand would treat women and men on terms of equality. (Brown Aff. Ex. E at [p. 109].) In reliance on Vassar's representations, Yu accepted admission to Vassar and paid over $120,000 each for his freshman academic year and his sophomore academic year, which included the costs of Mr. Yu's tuition, room and board fee, activities fee, health insurance fee and school supplies. (Yu Decl. ¶ 45.)

## 3. The New York General Business Law Section 349 Claim.

Vassar argues that an action for violation of New York General Business Law § 349 cannot be made because Vassar complied with its representations in its policies and regulations. (Df Mem. 19-20.) Vassar errs because, as discussed above (pp. 19-20, 23-24), Vassar did not comply with representations in its policies and regulations. The facts of this case (pp. 3-13) permit Yu to claim under General Business Law § 349, consumer-oriented misconduct (students are consumers) which is

materially misleading to a reasonable consumer who is damaged. *Wilner v. Allstate Insurance Company*, 2010 NY Slip Op 248; 893 N.Y.S.2d 208 (2d Dep't 2010); *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995).

### 4. The Negligence Claim.

Vassar argues that a claim for negligence cannot be made here because there is no action for negligent investigation or prosecution. (Df Mem. 22.) Here, however, the Third Restatement of Torts identifies as a "special relationship" in the school-student relationship. Restatement (Third) of Torts: Liability for Physical Harm § 40, Proposed Final Draft (April 6, 2005). A school does owe a duty to protect students from harm inflicted by false allegations of sexual misconduct, a duty that based on the discussion above under Title IX, Vassar breached causing damage to Yu. *Becker v. Schwartz*, 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978) (negligence elements).

### 5. The Intentional Infliction of Emotional Distress Claim.

Vassar argues that the conduct in this case falls short of the outrageous conduct required for the tort of intention a infliction of emotional distress. (Df Mem. 21-22.) But that argument is based on Vassar's sanitized mistreatment of the facts. The rushed prosecution in a Star Chamber proceeding and damage to Peter Yu was most certainly outrageous conduct.

### CONCLUSION

Based on the foregoing, Defendant Vassar College's motion for summary judgment should be denied, and the Court should order such further and other relief as deemed just and proper.

Dated:   New York, New York
       May 16, 2014              **NESENOFF & MILTENBERG LLP**
                           **Attorneys for Plaintiff Xiaolu Peter Yu**

                           By:_____/s/_____
                               **Andrew T. Miltenberg, Esq. (AM 7006)**
                               **Kimberly C. Lau, Esq. (KL 9374)**
                               **Philip A. Byler, Esq. (PB 1234)**
                           **363 Seventh Avenue – Fifth Floor**
                           **New York, New York 10001**