UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: MAR 3 1 2015

XIAOLU "PETER" YU,

                           Plaintiff,

            -against-

VASSAR COLLEGE,

                           Defendant.

No. 13-CV-4373 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Xiaolu "Peter" Yu brings this action against Defendant Vassar College for sexual discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and various state law causes of action. Before the Court is Vassar's motion for summary judgment. For the reasons that follow, Vassar's motion is granted.

## BACKGROUND[1]

### I.      General Background

Yu is a Chinese citizen who has resided in the United States since 2008, when he enrolled in boarding school in Connecticut. (Def.'s 56.1 Statement ¶ 3.) He later enrolled at Vassar College, a residential liberal arts college in Poughkeepsie, New York, where he remained a student

---

[1] Yu lodges various objections to Vassar's Local Rule 56.1 statement ("Def.'s 56.1 Statement"), although many of these objections do not set forth specific facts that contradict those asserted by Vassar; rather, they merely add additional information. The Court thus adopts the agreed-upon portions of the facts as undisputed and relies upon them for this statement of facts. The Court also draws upon the parties' affidavits, declarations, and exhibits attached thereto, except for the portions for which admissibility has specifically and properly been challenged (see Plaintiff's Rule 56.1 statement ("Pl.'s 56.1 Statement") at ¶¶ 4[1]c, 42c, 46b.). See Fed. R. Civ. Proc. 56(c)(2); Klingman v. Nat'l Indem. Co., 317 F.2d 850, 854 (7th Cir. 1963) ("if no objection is made to an affidavit which is objectionable under Rule 56[], the affidavit may be considered by the court in ruling on the motion"); Tile Setters and Tile Finishers Union of New York & New Jersey, Local Union No. 7 of the Int'l Union of Bricklayers & Allied Craftworkers, No. 06-CV-784-NGG, 2007 WL 922286, at *2 n.2 (E.D.N.Y. Mar. 26, 2007) ("by failing to raise the issue, each party has waived any objection to its adversary's failure to comply with Rule 56[]").

until his expulsion in March 2013. (Id. at ¶ 1, ¶ 2.) The circumstances of his expulsion form the basis of this case.

On February 18, 2013, another student at Vassar (the "Complainant"),[2] reported to a member of Vassar's Sexual Assault Response Team that she had been sexually assaulted by Yu. (See Brown Aff. Ex. A.) Vassar began an investigation, led by its Title IX investigator Richard Horowitz, with the assistance of Vassar's Associate Director of Security, Kim Squillace. (Def.'s 56.1 Statement ¶ 7.) On February 26, 2013, Horowitz sent an email to Julian Williams, Vassar's Director of the Office of Equal Opportunity and Affirmative Action ("EO/AA"), who oversees allegations of sexual misconduct, copying David Brown, Vassar's Dean of Students, informing them that he had concluded his investigation and that Yu may have violated Sections 5.05 and 20.2 of Vassar's College Regulations. (Horowitz Aff. Ex. E.)

> Section 5.05 of the College Regulations provides as follows:

> 5.05 Sexual Misconduct offenses include, but are not limited to, non-consensual sexual contact (or attempts to commit same), non-consensual sexual intercourse (or attempts to commit same), and sexual exploitation.
> . . .
> Non-consensual sexual intercourse is any sexual intercourse, however slight, or with any object, by a person upon a person, that is without consent and/or by force.

(Yu Decl. Ex. L at 138.)[3]

Section 20.2 provides that "[n]on-consensual sexual intercourse is any sexual intercourse, however slight, with any object, by a person upon a person, that is without consent and/or by force." (Id. at 144.)

---

[2] Vassar, in order to be in compliance with the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g(b), (d), has filed redacted versions of the materials in support of its motion and, in its briefing, refrained from mentioning by name any of the students involved in this matter, aside from Plaintiff Yu. The Court will do the same.

[3] Page numbers to the exhibits refer to Bates numbers, where available, or the original page numbers of the documents themselves.

The Vassar College Student Conduct Sanctioning Parameters provide that a student may be subject to sanctions ranging from probation to expulsion for violations of Section 5.05 and from suspension to expulsion for violations of Section 20.2.  (Brown Aff. Ex. B.)

Following a March 7, 2013 disciplinary hearing before an Interpersonal Violence Panel ("IVP"), Yu was found to have violated both of the above sections and was expelled.  (Brown Aff. Ex. D.)

## II.     Yu's and Complainant's Divergent Version of Events

The parties agree that the incident in question took place one year before Complainant's report to the school.  (See Def.'s 56.1 Statement ¶ 6; Pl.'s 56.1 Statement ¶ 6c.)  From there, their accounts diverge.

### A.  Yu's Version of Events

Yu claims that on the night of February 18, 2012, he was at a Vassar rowing team party on campus where he saw Complainant, a fellow rowing teammate.  (Yu Decl. at ¶ 2.)  Yu was supposed to meet Student B, another teammate with whom he had previously had an "intimate" relationship.  (Id. at ¶ 3.)  At the rowing party, Yu and Complainant consumed alcohol and began talking to each other.  (Id. at ¶ 4.)  The two left the party and went to "The Mug," a "social hangout venue" on campus.  (Id.)  According to Yu, Complainant did not require assistance walking; "to the contrary, [she] placed her arm around [his] shoulders as a sign of intimacy." (Id.)

At The Mug, Yu and Complainant kissed "for a while."  (Id. at ¶ 5.)  Yu asked Complainant if she wanted to have sex and she agreed.  (Id.)  Complainant then called her roommate to inquire about the "availability" of her dorm room.  (Id.)  Complainant could not get in touch with her roommate so the two went to Yu's dorm instead.  (Id.)

3

Complainant and Yu then walked from The Mug to Yu's dorm with her arms again "placed . . . around [him]." (Id. at ¶ 6.) At this time, Student B and another rowing team member, Student A, observed Complainant walking with Yu. (Id.) During the walk, Complainant asked Yu if he wanted to have breakfast or dinner the next day, to which he responded, "no." (Id. at ¶ 7.)

Upon arriving at Yu's room, Complainant went to use the bathroom before returning to Yu's room. (Id. at ¶ 8.) Yu then left to use the bathroom himself while Complainant waited in his room. (Id.) When he returned, he told Complainant that it was his "first time" and she responded "it's okay, I know what to do." (Id. at ¶ 9.) Complainant then undressed herself while Yu, with Complainant's assistance, did the same. (Id.) They then kissed and Complainant began to perform oral sex on Yu, stating, "I know how to do this; I have done this before." (Id. at ¶ 10.) Complainant picked up the condom next to the bed, and using her hand and her teeth, ripped it open and placed it on Yu. (Id.) Yu then began performing oral sex on Complainant while she instructed him on where and how to do so. (Id.) They then began engaging in sexual intercourse while kissing. (Id.) At one point, Complainant changed positions and got on top of Yu. (Id.)

While in the act, Yu's roommate entered the room and Yu asked him to leave. (Id. at ¶ 11.) Following the interruption, Yu and Complainant did not resume sexual intercourse. (Id.) Complainant began talking about her ex-boyfriend and stated that she was not ready for "anything new." (Id.) Complainant then got dressed and commented on how she "took [Yu's] virginity." (Id.)

Shortly after Complainant left, Yu's student fellow/resident advisor (the "Student Fellow"), knocked on the door and asked Yu to step out into the hallway. (Id. at ¶ 12.) The Student

4

Fellow questioned Yu about his "party habits" while Yu noticed Student A standing at the doorway of his room. (Id.) Yu later learned that Student A had coordinated with the Student Fellow so that she could enter Yu's dorm to search for Complainant while the Student Fellow distracted Yu in the hallway. (Id.)

The next morning, the Student Fellow advised Yu that two students, later determined to be Student A and Student B, had observed Yu walking with Complainant, who appeared to be drunk, and tried to alert campus security. (Id. at ¶ 13.) Campus security never visited Yu. (Id.)

### B. Complainant's Version of Events

Complainant's version of events, as reported in her statements to Vassar's investigators, summarized in Horowitz's report, and submitted to the Vassar hearing panel, is very different. (See Horowitz Aff. Exs. A, C, F; Roellke Aff. Ex. A at VAS 1314-18, 1325.) Complainant claims that she tried to avoid Yu at the rowing team party, where he was "hitting" on her. (Horowitz Aff. Ex. A at VAS 1541.) At the party, she consumed several glasses of punch without knowing what type of alcohol it contained and became intoxicated. (Horowitz Aff. Ex. A at VAS 1541; Ex. C at VAS 432; Ex. F at VAS 423.) She initially turned down an offer by Yu to go to The Mug, but eventually ended up leaving the party and going to The Mug with him. (Horowitz Ex. F at VAS 423.) She stated that she did not remember walking to or spending time at The Mug. (Horowitz Ex. F at VAS 423; Roellke Aff. Ex. A at VAS 1315.) She did remember, however, Yu asking for a kiss and her reply being "I only kiss people I am in a relationship with." (Roellke Aff. Ex. A at VAS 1315; Horowitz Ex. C at VAS 432.)

At some point in the evening, either on the way to The Mug or on the way to his dorm, Yu said he wanted to have sex with Complainant and/or asked if she wanted to go to his room, to which she either said nothing or said "no." (Horowitz Ex. A at VAS 1541; Ex C. at VAS 432;

Ex. F at VAS 428.) In her statement to the investigators, she said that she "remember[ed] feeling helpless, like [she] couldn't talk" and "had to do whatever he said." (Horowitz Ex. C at VAS 432.) She eventually found herself in Yu's room, where she said that events were "fuzzy" to her. (Roellke Ex. A at VAS 1325.) Complainant believed that Yu removed all of her clothing. (Horowitz Ex. A at VAS 1541; Ex. C at VAS 433; Roellke Ex. A at VAS 1316.) Yu then pushed Complainant's face into his crotch area for her to perform oral sex on him, stating, "you should like it, and kiss it" referring to his penis. (Horowitz Ex. C at VAS 433; Ex. A at VAS 1541; Ex. F at VAS 426.) She tried to resist but was unable to do so. (Horowitz Ex. A at VAS 1541; Ex. C at VAS 433.) She felt, she said, "physical[ly] entrap[ped]." (Horowitz Ex. C at VAS 433.)

The next thing Complainant remembered was being on her back with Yu on top of her and forcibly engaging in sexual intercourse. (Horowitz Ex A at VAS 1541; Ex. C at VAS 433; Ex. F at VAS 426.) She tried to push him off but was unable to. (Horowitz Ex. A at VAS 1541; Ex. C at VAS 433; Ex. F at VAS 426.) After what seemed like a long time to her, Yu stopped and Complainant got up, got dressed, and left Yu's room. (Horowitz Ex. C at VAS 433; Ex. F at VAS 428.)

### C. The Facebook Messages

On February 19, 2013, the day after the incident, Yu sent a Facebook message to Complainant, saying "Hey, wish you didn't have a really bad hangover. I was really drunk last night and I feel maybe i was way too forward. I'd be more shy if i was more sober. I just want to make sure that you are okay." (Yu Decl. Ex. A at 4.) Complainant replied:

> Peter, I was really drunk as well, don't worry I actually don't have a bad hang over today how about you? I realized I just am way too close to my previous relationship which was really serious so I can't date any one yet. I'm really sorry I led you on last night I should have known better then to let my self drink yet, I really don't want this to effect our team dynamic or friendship. I don't think any

6

less of you at all I had a wonderful time last night I'm just too close to my previ-
ous relationship to be in one right now.

(Id.)

Yu responded, saying "I totally understand you and i'm glad we are still friends.  Appar-
ently somebody called security on me last night cuz they thought i might be potentially hurting
somebody and my student fellow went nuts on me today haha:P[.]"  (Id. at 5.)  Complainant re-
plied, "oh I'm really sorry! also did they write you up? . . . I will stand up for you because you
were not[.]"  (Id.)  Yu then said "don't worry i i didn't even se the securties, it's just my stuednt
fellow is overreacting and he told me that somebody called security haha[.]"  (Id. at 6.)  Com-
plainant replied, "oh okaygoodI just wanted to make sure you didn't get in trouble[.]"  (Id.)

Approximately one month later, on March 20, 2012, Complainant sent Yu another Face-
book message, saying:

> Peter, I wanted to write to you to apologize for that night about two months ago, I
> have not been trying to avoid you since then.  I am really sorry, it was very irre-
> sponsible of me to get drunk and do that with you.  I really don't want it to effect
> our friendship or team dynamic. . . .  I did not treat you very well, and it was dis-
> respectful on my part to do what I did because I was drunk.  I would really like to
> be your friend I think you are a really cool guy and I don't want this to get in the
> way! . . . [I]f you want to try to be friends I would really like that because you are
> also my team mate and I care about you and I never ever meant to hurt you and
> we were both drunk.  I hope we can both put it behind us as a memory and learn
> from it . . . .

(Id. at 7.)  Yu responded by saying:

> [T]hanks for the concern.  I am totally fine and I was honestly surprised by this
> extremely long message.  Thanks anyway for being so considerate.  I say we
> should just forget about it.  I was so drunk I didn't know what i was doing.  I am
> sure that's the case for you as well. . . .  Just curious tho, what made you so con-
> cerned all the sudden?

(Id. at 8.)  Complainant responded:

> [H]onestly I have been feeling guilty about it for awhile and after we went on
> spring break and during spring break I felt worse because I hadn't said I was sorry

> and then when everyone was saying how much closer to the team they had gotten over spring break and stuff at the dinner last night at the team dinner, I just felt really bad.

(Id.) Yu and Complainant continued communicating over Facebook sporadically in May and October 2012. (Id. at 8-13.)

These Facebook messages were the subject of questioning during both the investigation and the hearing. In Yu's view, these messages are proof that the encounter was consensual and that Complainant's subsequent account of the events "simply lacked credibility." (Opp. at 20.) As discussed in more detail below, Complainant explained that these messages "did not correctly reflect her feelings" because she was "in a state of 'shock and disbelief'" at the time. (Horowitz Ex. F at VAS 423.)

### D. The Investigation

After Complainant reported that Yu had assaulted her, Horowitz began his Title IX investigation. The investigation involved interviewing Yu, Complainant, and the students who witnessed Yu and Complainant together on the night in question. (Horowitz Aff. Ex. A, F.)

On February 27, 2013, the day after being notified that Horowitz had concluded his investigation, Dean Brown sent a letter to Yu informing him that an investigation had been conducted based on a complaint and that he may be in violation of Sections 5.05 and 20.2 of the College Regulations. (Bogdan Decl. Ex. C.) The letter enclosed a copy of the relevant pages of the College Regulations, as well as a copy of the rules and procedures of the IVP that would be convened to hear the case. (Id.) The information included an enumerated statement of Yu's rights. (Id. at 00027-28.) Brown's letter notified Yu that he would have at least 24 hours to review the documentation related to the case "as is appropriate to acquaint you with the evidence

gathered in this case." (Id. at 00016.) The letter also informed Yu that the hearing was sched-
uled for March 7, 2013. (Id.) Yu was asked to call Brown as soon as possible to discuss panel
procedures, and also to contact Horowitz. (Id.)

On the same day, Horowitz sent Yu an email informing him of when the IVP hearing
would take place, which provisions of the College Regulations he allegedly violated, and to offer
him further information about the process so as to help Yu "be as comfortable as possible."
(Horowitz Aff. Ex. K at VAS 1162.) Yu emailed Horowitz a series of questions, including when
he would be able to review the evidence file and where he could obtain a copy of the student
handbook, all of which were answered. (Horowitz Aff. Ex. K.) Additionally, on February 28,
2013, Horowitz emailed Yu, telling him "I mentioned, when we met, that the issues of incapaci-
tation and consent would be the primary issue[s] addressed with regard[] to the incident, but I
should also share that there will also be questions regarding force. You'll have all the infor-
mation as soon as [Brown] has the file ready for you." (Horowitz Aff. Ex. L.)

At the conclusion of Horowitz's investigation, he drafted a written summary (the "Inves-
tigator Report"), which was included in the hearing file. (Horowitz Ex. F; Def.'s 56.1 Statement
¶ 23.) Regarding the two witnesses who had seen Yu and Complainant walking to Yu's room,
Student A and Student B, Horowitz wrote that they "became concerned and made an effort to in-
tervene due to concern. [Complainant's] apparent high level of intoxication was noted by both
witnesses and was one, if not the primary, source of concern and motivation to intervene." (Hor-
owitz Ex. F at VAS 423.) The Investigator Report also quoted from the Facebook exchanges and
mentioned that Complainant had stated that "she said these things at the time because she was 'in
denial,' 'extremely scared' and in a state of 'shock and disbelief'" and that "the exchange did not
correctly reflect her feelings." (Id.)

On March 4, 2013, after the conclusion of the investigation, Horowitz sent an email to Brown letting him know that Yu had asked for two additional students to serve as witnesses. (Horowitz Aff. Ex. G.) One was Complainant's roommate, who "might be able to confirm whether or not [Complainant] tried to call her on that evening." (Id. at VAS 753.) The other was Yu's roommate, who could "confirm that he walked in on the two and quickly closed the door and left." (Id.) Brown replied that it was ultimately up to Horowitz whether to call the two witnesses but that it would "probably [be] ok if it appears helpful for a panel in making a decision." (Id.) Horowitz responded, saying "[m]y dominant concern is that [Yu] be given every opportunity to fully present his case. . . . Let's invite them on in, then." (Id.)

Horowitz reached out to both potential witnesses but neither was able to attend the hearing. (Horowitz Ex. H-J.) Accordingly, he invited them to provide written statements. (Id.) As to Complainant's roommate, she told Horowitz over email that she could not remember missing a phone call from a year ago and that she could not check her call log because she no longer had the same phone. (Horowitz Ex. J.) Yu's roommate told Horowitz over email that he

> [O]pened the door, saw Peter in bed with someone else and he asked me to leave. . . . I left after I walked in on Peter and this other person. I was fairly sure that Peter and/or the other person may have been intoxicated because of the unusually forceful way Peter told me to leave, but I can't be sure of that for a fact. That's all that I witnessed. This happened within the span of probably 30 seconds to a minute, so I didn't witness very much besides what I just said . . . .

(Horowitz Ex. I at VAS 1120-21.) Upon further questioning by Horowitz regarding his comment about intoxication, Yu's roommate stated:

> By that I mean that Peter was typically not very aggressive/assertive when it came to talking with me, on basically anything. But when I walked in on him and the other person, he was forceful and very quick to tell me to leave, which lent me to assuming that he was intoxicated (and maybe the other person, but I can't be sure of that.)

10

(Id. at VAS 1120.)  Horowitz then asked whether Yu could have been forceful and quick simply

because he had someone in bed with him.  (Id.)  Yu's roommate agreed, saying "as you said,

given the circumstances, how he acted doesn't necessarily mean he was intoxicated."  (Id.)  Hor-

owitz informed Yu that neither of his proposed witnesses could attend the hearing, but that he

had asked for written statements.  (Horowitz Ex. H.)[4]

### E.  The Hearing

In addition to exchanging emails and meeting with Horowitz, Yu, in the days leading up

to the IVP hearing, also emailed with Brown regarding questions about the hearing procedure.

(Brown Aff. Ex. C.)  Brown answered all of Yu's questions.  (Id.)

On March 4, 2013, three days before the IVP hearing, Yu was given access to the hearing

file.  (Def.'s 56.1 Statement ¶ 23.)  The file consisted of the letter notifying him of the charges

against him, the Investigator Report, Complainant's statements to the investigators, witness state-

ments, Yu's own written statement, the Facebook messages (which Yu had submitted to the

investigators), the names of the witnesses who would testify at the hearing, and the names of the

panel members.  (Id.)

The hearing was held on March 7, 2013.  (Id. at ¶24.)  According to the IVP Rules and

Procedures, which were provided to Yu, the IVP is composed of "1 elected student, 2 appointed

faculty members, and an administrator (or faculty member) who is assigned to serve as a Chair.

If either the complainant/alleged victim . . . or the respondent/accused student prefers, all three

panelists will be faculty members."  (Bogdan Decl. Ex. C at 23.)  Because Complainant had re-

quested that all three panelists be faculty members, there were no students on the panel.  (Yu

Decl. Ex. B.)  Luis Inoa, Assistant Dean of Residential Life, served as the non-voting Chair of

---

[4] Yu stated in his deposition that Horowitz told him that he did not include the emails from the roommates in the hearing file because Horowitz "did not find [them] to be important."  (Bogdan Decl. A at 34:15-35:11.)

the panel. (Def.'s 56.1 Statement ¶ 25.)  The voting panel consisted of Jane Parker, an Athletics and Physical Education Lecturer (Parker Aff. ¶¶ 1, 2); Jamie Kelly, an Assistant Professor of Philosophy (Kelly Aff. ¶¶ 1, 2); and Sophia Harvey, an Assistant Professor of Film (Yu Decl. ¶ 27.)  Yu had expressed concern that, because Complainant's father was a faculty member, the panel not be conflicted.  (Yu Decl. ¶ 20; Ex. B.)

At the hearing, Yu, Complainant, Horowitz, and the three student witnesses (Student A, Student B, and the Student Fellow) all testified.  (Def.'s 56.1 Statement ¶ 28; Pl.'s 56.1 Statement ¶ 28a.)[5]  Yu was able to question all witnesses, although, as required by the IVP Rules and Procedures, his questions were made through Inoa, the panel Chair.  (Kelly Aff. ¶ 4; Parker Aff. ¶ 3; Yu Decl. ¶ 28.)  Yu would direct his question to Inoa, who would then ask the witness the question.  (Id.)  Yu maintains that Inoa "did not ask many of [Yu's] questions and . . . allowed [Complainant] to be non-responsive.  Also, panel Chair Inoa interrupted or otherwise did not allow [Yu's] questions to Horowitz."  (Pl.s' 56.1 Statement ¶ 30a.)

In response to questioning from Yu (through Inoa), Complainant testified at the hearing that the statements she made on Facebook "[did] not reflect any truth of how [she] felt that day because [she] was just trying to cope."  (Roellke Aff. Ex. A at VAS 1317.)  As to the messages wherein she stated that she "wanted to . . . apologize for that night," which were made approximately one month after the incident, she stated at the hearing that she had heard that Yu was upset and was "trying to make amends."  (Id.)  She stated that she was "trying to make sure [she] was on good terms with all [her] teammates."  (Id.)  When asked if she was "still in shock and

---

[5] This testimony was not sworn, in accordance with the IVP Rules and Procedures.  (Pl.'s 56.1 Statement ¶ 28a; Bogdan Decl. Ex, C at 23 ("Sessions of the IVP are administrative hearings, not trials.  No one is placed under oath at hearings.").)

denial when [she] initiated [that portion of the] Facebook conversation," she replied that she was "[l]ess shocked because [she] had some time, but over all, yes." (Id.)

As recounted by Horowitz and the panelists, the main issue before the IVP was "the incapacitation of the complainant and whether or not there was enough information to say she was more likely than not incapacitated." (Lau Decl. Ex. 1 (Horowitz Deposition) at 258:12-15; Kelly Aff. ¶ 7 (IVP decision based, among other things, on Complainant's "level of intoxication"); Park Aff. ¶ 5 (same).) Vassar's College Regulations provide that "[c]onsent cannot be gained by . . . taking advantage of the incapacitation of another, where the accused knows or should have reasonably known of such incapacitation." (Yu Decl. Ex. L at 125.) "Incapacitation" is defined as "a state where someone cannot make rational, reasonable decisions because they lack the capacity to give knowing consent (e.g., to understand the 'who, what, when, where, why or how' of their sexual interaction)." (Id.) The Regulations go on to state that "incapacitation is determined on a case-by-case basis. It will include an analysis of whether the accused knew, or a sober, reasonable person in the position of the accused should have known, that the complainant was incapacitated." (Id. at 126.) Because of this reasonable person standard, the accused's level of intoxication is not considered. (See Horowitz Aff. Ex. F at VAS 426 ("[Yu]'s level of intoxication does not matter. . . . It is an objective question [of] 'what would a reasonable person, in the position of the accused, have known?' . . . . Intoxication does not excuse accountability for a violation of the regulations."); Lau Suppl. Decl. Ex. 6 at 83:4-10, 83:23-84:1 (Williams testifying in his deposition that "the level of . . . voluntary intoxication[] by the respondent typically isn't a factor that the panelists are concerned with" and that "the level of incapacitation on behalf of the respondent is not a factor that is either . . . mitigating . . . or . . . exculpatory"); Yu Decl. Ex. L at 124 ("Use of alcohol . . . will never function as a defense to a violation of this policy").)

After deliberating at the close of the hearing, the IVP found Yu responsible for violations of Sections 5.05 and 20.2 of the College Regulations. (Inoa Aff. Ex. A; Parker Aff. ¶ 5; Kelly Aff. ¶ 7.) Yu was so informed in the hearing room. (Bogdan Decl. Ex. A at 176:11-17.) The IVP's written findings (the "IVP Written Findings"), drafted and signed by Inoa, list the following under "Information that was considered in reaching a decision regarding responsibility for violations": "The 3 witnesses"; "Investigator finding"; "Complainant testimony"; "Respondent testimony." (Inoa Aff. ¶ 7; Ex. A at VAS 377.) Under "Information that was NOT considered in reaching a decision regarding responsibility," the IVP Written Findings state, "We did not consider a claim in [Student A's] testimony stating the respondent was involved in a prior 'sexual assault.'" (Id.) Also under "Information that was NOT considered," the IVP Written Findings list, but then crosses out, "Facebook chat because it occurred after the in[. . . .]" (Id.) Under "Recommended sanctions," the IVP Written Findings state "Expulsion." (Id.)

In the affidavits submitted for this litigation and in deposition testimony, the panelists indicated that their decision was based on credibility determinations made in favor of Complainant and the witness testimony corroborating her incapacitation. (See Bogdan Suppl. Decl. Ex. A at 69:4-6, 131:15-22 (Kelly testifying at deposition that the student witnesses' testimony "corroborated [Complainant's] claims about her level of intoxication and incapacitation" and that it "was important" that Complainant's "narrative[] of events leading up to the incident" was "supported by the testimony of those individuals in the moments that they saw [Complainant] prior to it"), 113:11-19 (Kelly testifying that he did not think Yu's claims were credible because "[t]hey didn't cohere with the witness testimony, [Complainant's] account and just didn't seem to fit with everything else in the case"), 96:16-18 (Kelly testifying that with regard to the Facebook messages, he "weighed [Complainant's] testimony and tried to evaluate it and found it to be

credible"); Kelly Aff. ¶ 7 ("This determination was based on our consideration of the evidence as a whole including, among other things, that other witnesses corroborated Complainant's testimony concerning her level of intoxication."); Parker Aff. ¶ 5 (same); (Bogdan Reply Decl. Ex. A at 99:20-23 (Harvey testifying at her deposition that in assessing the credibility of the witnesses, "part of the process is to look at consistency of witness statements and . . . the witness statements seemed very consistent").)

The day after the hearing, Brown informed Yu in writing that he had been expelled. (Def.'s 56.1 Statement ¶ 56.)

### F. The Appeal

Yu was informed that he may appeal the IVP decision on grounds of (1) procedural error; (2) new evidence; or (3) sanctions disproportionate to the severity of the violation. (Id. at ¶ 58.) Yu exchanged emails with Christopher Roellke, the Dean of the College, with questions about the appellate process. (Roellke Aff. Ex. B.) Yu subsequently submitted an appeal of his expulsion to the Appeal Committee on grounds of procedural error and disproportionate sanctions. (Def.'s 56.1 Statement ¶ 62.) In response, Complainant and Inoa also submitted statements to the Appeal Committee. (Id. at ¶ 63.) On March 27, 2013, the Appeal Committee denied Yu's appeal. (Id. at ¶ 64.) Roellke sent Yu an email on the same day notifying him that the Appeals Committee had voted unanimously to uphold the IVP decision and sanctions. (Roellke Aff. Ex. E.)

### G. Procedural History

On June 25, 2013, Yu filed his Complaint in this matter, alleging eight causes of action: (1) gender discrimination in violation of Title IX; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) unfair or deceptive trade practices; (5) estoppel and

reliance; (6) intentional infliction of emotional distress; (7) negligence; (8) declaratory judgment. After discovery was completed, Vassar moved for summary judgment on all of the claims and this case was reassigned from Judge Baer.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden of showing that no genuine issue of material fact exists rests with the moving party. Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). "Where the moving party does not bear the ultimate burden of proof at trial, the summary judgment burden may be satisfied by pointing out the absence of evidence to support the non-movant's claims." Harker v. Utica Coll. of Syracuse Univ., 885 F. Supp. 378, 384 (N.D.N.Y. 1995) (citing Celotex, 477 U.S. at 325). "Once the movant shows the absence of such evidence, the burden of persuasion shifts to the non-movant to show that the record contains sufficient evidence to establish each element of its case." Id.

The court must "draw all factual inferences in favor of the party against whom summary judgment is sought," Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989) and "construe the evidence in the light most favorable to the nonmoving party." United States v. All Funds Distributed to Weiss, 345 F.3d 49, 53 (2d Cir. 2003).

## DISCUSSION

There has been much debate in recent times about the most effective method for addressing the formidable problem of sexual assault on college campuses. College administrators, politicians,

academics and students alike have clashed on how best to balance the interests and rights of complainants with those of the accused. The Court's role, of course, is neither to advocate for best practices or policies nor to retry disciplinary proceedings. See Doe v. Univ. of the South, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("this Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding" (internal quotation marks omitted)). Here, the sole questions before the Court are whether when Vassar College expelled Peter Yu for sexually assaulting a fellow student, it discriminated against him based on his gender in violation of Title IX, or otherwise violated a provision of state law. For the reasons stated below, the record before the Court establishes that it did not.

## I. Title IX

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . . ." 20 U.S.C. § 1681(a). There is no dispute that Title IX applies to Vassar.

Unlike with Title VII of the Civil Rights Act of 1964, which provides private rights of action against both intentional discrimination (known as "disparate treatment") and practices that, while not intentionally discriminatory, have a disproportionately adverse effect on a protected class (known as "disparate impact"), see Ricci v. DeStefano, 557 U.S. 557, 577 (2009), it does not appear that a private right of action for disparate impact is cognizable under Title IX.[6]

---

[6] The Supreme Court has held that "Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination." Jackson v. Birmingham, 544 U.S. 167, 173 (2005) (citing Cannon v. Univ. of Chicago, 441 U.S. 677, 690-93 (1979)) (emphasis added). It has further noted that Title VI, on which Title IX was patterned, "prohibits only intentional discrimination." Alexander v. Sandoval, 532 U.S. 275, 280 (2001). Since Title IX is to be interpreted and applied in the same manner as Title VI, see Cannon, 441 U.S. at 696, it follows that Title IX also reaches only intentional discrimination. While the Supreme Court has found that regulations implementing Title VI may reach activities that have a disparate impact, it has also held that there is no private right of action to enforce such regulations. See Alexander, 532 U.S. at 281, 293. Accordingly, numerous courts have dismissed private actions to enforce Title IX itself or regulations implementing Title IX when the allegations were based on a disparate

Perhaps for this reason, Yu has not advocated that the Court consider a disparate impact theory of liability, nor have the parties raised or briefed the issue.

In the context of university discipline, the Second Circuit has recognized two categories of Title IX claims: (1) claims of an erroneous outcome from a flawed proceeding, and (2) claims of selective enforcement. Scott v. WorldStarHipHop, Inc., No. 10-CV-9538-PKC, 2011 WL 5082410, at *4 (S.D.N.Y. Oct. 25, 2011) (citing Yusuf v. Vassar Coll., 35 F.3d 709, 714-16 (2d Cir. 1994)). "In the former case, a party asserts that he or she was innocent and wrongly found to have committed the offense; in the latter case, a party asserts that, regardless of guilt, the severity of the penalty was affected by the student's gender." Id. A plaintiff must show that "gender bias was a motivating factor" behind the erroneous outcome or the severity of the penalty. Id. Yu brings claims of both an erroneous outcome and selective enforcement.

### A. Erroneous Outcome

Vassar argues that Yu cannot show that the disciplinary proceedings were "flawed" because they were in compliance with Title IX's implementing regulations and guidance, which require that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited." 34 C.F.R. § 106.8(b); see also Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011) (available at

---

impact theory. See, e.g., Weser v. Glen, 190 F. Supp. 2d 384, 395 (E.D.N.Y. 2002), aff'd, 41 F. App'x 521 (2d Cir. 2002) (dismissing Title IX disparate impact claims in light of Alexander); Barrett v. W. Chester Univ. of Penn. of State Sys. of Higher Educ., No. CIV.A. 03-CV-4978, 2003 WL 22803477, at *11 (E.D. Pa. Nov. 12, 2003) (after Alexander, plaintiffs "cannot pursue a private right of action to enforce disparate impact regulations under [Title IX]"); E.L. ex rel. Bachman v. Penn Harris Madison Sch. Sys., No. 3:05-CV-717-RM, 2006 WL 2512077, at *1 (N.D. Ind. Aug. 28, 2006) (rejecting Title IX disparate impact claim).

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf) ("Dear Colleague Letter").[7]  Yu counters that Vassar's procedures denied him basic due process and that Vassar did not comply with its own procedures.  Vassar also argues that Yu has failed to show that the outcome of the disciplinary proceeding was erroneous or motivated by gender bias.  Yu responds primarily that the IVP could not have believed Complainant's version of events in the face of the contradictory and exculpatory Facebook messages but for gender bias, and that Vassar's policy of only considering the intoxication and incapacitation of female complainants but not male respondents is discriminatory.  Yu further argues that Vassar afforded preferential treatment to Complainant.

The record establishes that there is no material factual issue as to whether Yu's disciplinary proceeding was flawed and thus may have resulted in an erroneous outcome, or that, even if there had been such flaws or errors, these deficiencies were due to gender bias, as he must show in order to state a Title IX claim.  To the extent that Yu simply disagrees with the IVP's decision, the Court cannot now – absent flawed process *and* gender discrimination – second-guess the panelists' credibility determinations and factual conclusions.

### 1.  Flawed Proceeding

#### a.  Due Process

As an initial matter, to the extent that Yu is claiming that Vassar's disciplinary proceedings denied him constitutional due process, this argument is without merit.  Since Vassar is a private college, and not a state actor,[8] "the federal Constitution does not establish the level of due

---

[7] The Dear Colleague Letter is a "significant guidance document," as defined by the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices.  See Dear Colleague Letter at 1 n.1; 72 Fed. Reg. 3432.  It "does not add requirements to applicable law, but provides information and examples to inform recipients about how [the Office for Civil Rights] evaluates whether covered entities are complying with their legal obligations." Dear Colleague Letter at 1 n.1.

[8] Yu nowhere presents evidence or argues that Vassar is a state actor.

process that [Vassar] had to give [Yu] in his disciplinary proceeding." Bleiler v. Coll. of Holy
Cross, No. 11-CV-11541-DJC, 2013 WL 4714340, at *4 (D. Mass. Aug. 26, 2013); see also
Rensselaer Soc'y of Eng'rs v. Rensselaer Polytechnic Inst., 689 N.Y.S.2d 292, 295 (3d Dep't
1999) ("the relationship between a private university and its students . . . is essentially a private
one such that, absent some showing of State involvement, their disciplinary proceedings do not
implicate the full panoply of due process guarantees" (internal quotation marks omitted)); Dear
Colleague Letter at 12 ("Public and state-supported schools must provide due process to the al-
leged perpetrator.")

That said, a "private university, college, or school may not arbitrarily or capriciously dis-
miss a student." Bleiler, 2013 WL 4714340, at *5 (internal quotation marks omitted).  The Dear
Colleague Letter provides that "prompt and equitable" resolution of sexual violence complaints
shall include, among others, the following "critical" elements: "[n]otice to students . . . of the
grievance procedures"; "[a]dequate, reliable, and impartial investigation of complaints [including
any hearing], including the opportunity for both parties to present witnesses and other evidence";
"[n]otice to parties of the outcome of the complaint . . . ." Dear Colleague Letter at 9, 11.  To
this end, Yu makes several allegations as to how his disciplinary proceeding was flawed.

### i.   Lack of Impartial Tribunal

Yu argues that he was denied an impartial tribunal in violation of Title IX because "the
[IVP] consisted of all faculty members when [Complainant's] father was and is a Vassar faculty
member." (Opp. at 15.)  This argument fails.[9]

---

[9] In his Complaint, Yu also alleges that Vassar violated its own regulations because the IVP was "only com-
prised of faculty members, despite [the fact that Yu] had the right to (and did so) request that students participate on
the [p]anel." (Compl. ¶ 57.)  The IVP Rules and Procedures provided to Yu in fact state, however, that "[i]f either the
complainant/alleged victim . . . or the respondent/accused student prefers, all three panelists will be faculty members."
(Bogdan Decl. Ex. C at 23.)  Here, Complainant had requested that the panelists all be faculty members.  (Yu Decl.
Ex. B.)

The record shows that conflict checks were conducted prior to the hearing, and, in any event, there is no evidence that the voting panelists were aware of the fact that Complainant's father was a member of the faculty. When Jane Parker was asked in her deposition when she was told the names of the students in this proceeding, she responded, "Before the hearing because we, you know, always make sure there is no sort of history. . . . We have to go to [Brown's] office to review the file to get a sense of it, first identify the students involved, make sure there is no conflict." (Bogdan Reply Decl. Ex. D at 31:21-32:7.) When asked if she was familiar with who Yu or Complainant were prior to the hearing, Parker said she was not. (Id. at 33:5-17.)

Similarly, in Sophia Harvey's deposition, she stated that Brown notifies the potential panelists of when the hearing file is complete so that they may review it to identify any conflict in advance of the hearing: "We are encouraged to view it as soon as possible, the completed file, because if you have to recuse yourself, there is time to find an alternative panel member." (Bogdan Reply Decl. Ex. A at 68:3-15.)[10] Harvey also stated that while she knew of Complainant's father, she was unaware that he had a daughter attending Vassar. (Id. at 36:4-22.) Yu does not identify any evidence to the contrary that would raise a triable issue as to the panelists' bias toward Complainant because of her father. See Bleiler, 2013 WL 4714340, at *13 (granting summary judgment on equity and due process claims where alleged conflicts of interest were "fully disclosed before the hearing and explored," by the administrator in charge, and where the administrator "concluded that both panel members believed that they did not have a conflict of

---

[10] As Yu points out, Harvey states in her deposition that she does not recall anyone actually asking her whether she had a relationship with Complainant's father. (Lau Decl. Ex. 3 at 38:2-14; Opp. at 6.) This fact alone, however, does not indicate, as Yu suggests, that a conflicts check was not conducted, nor is it inconsistent with the other testimony describing how conflicts checks were in fact performed, or the testimony establishing that the panelists were not aware that Complainant's father was on the faculty.

21

interest" and the "panel members did not know [the complainant] well and there was no sugges-tion . . . that either knew [the respondent].")[11]

### ii.    Rush to Convict; Inadequate Time to Prepare and Consult With Counsel

Yu next contends that the proceedings against him were unfair because Vassar "does not recognize a right to consult with counsel and rushed the proceedings so as to make it practically unavailable." (Opp. at 16.) Yu argues that it was only eight days from the day he was given no-tice of the charges to the day he was expelled, and only three days between his first opportunity to view the hearing file and the hearing itself. (Id.) These arguments are unavailing.

Yu's contention that "Vassar does not recognize a right to consult with counsel" is simply incorrect. The College Regulations explicitly state that "[i]t is the respondent/accused student's decision whether to seek the advice and assistance of an attorney at his/her own expense if legal advice is needed." (Bogdan Decl. Ex. C at 27.) While the rules go on to state that the respond-ent "may not be represented by legal counsel at meetings, investigatory interviews, informal resolution processes, or during a . . . hearing," this is in accord with the "general consensus . . . that 'at most the student has a right to get the advice of a lawyer; the lawyer need not be allowed to participate in the proceeding in the usual way of trial counsel . . . .'" Johnson v. Temple Univ.–Of Commonwealth Sys. of Higher Educ., No. CIV.A. 12-515, 2013 WL 5298484, at *10 (E.D. Pa. Sept. 19, 2013) (quoting Osteen v. Henley, 13 F.3d 221, 225 (7th Cir. 1993)). Yu

---

[11] Yu makes no specific reference to any potential conflict with regard to Inoa, the Chair of the IVP, although Inoa's deposition testimony shows that he was in fact aware that Complainant's father was a professor at Vassar. (Lau Decl. Ex. 5 at 146:9-11.) Inoa acknowledged that were he a voting member of the panel rather than the non-voting Chair, this may have constituted a conflict. (Id. at 146:12-15.) Yu has not cited to Inoa's deposition testimony in this regard or otherwise argued that Inoa was nevertheless conflicted, but even if he did, he has made no showing that any resulting erroneous outcome would have been caused by gender bias, as he must to state a Title IX claim. See Yusuf, 35 F.3d at 715 (allegations of a procedurally flawed proceeding that has led to an erroneous outcome required a "causal connection between the flawed outcome and gender bias"); Brown v. Castleton State Coll., 663 F. Supp. 2d 392, 403 (D. Vt. 2009) (plaintiff failed to show discriminatory intent where there were "many possible explanations" other than gender bias for the tribunal's allegedly dubious outcome).

22

points to no evidence otherwise showing that Vassar interfered in any way with his right to consult an attorney.

As to the purported "rush to convict," Yu cites no authority for the proposition that eight days between the notice of charges and the verdict, or three days between the presentation of evidence and the hearing, is inherently inadequate. Indeed, courts have not disapproved of notice of charges given just one day prior to the hearing. See Doe, 687 F. Supp. 2d at 753; see also Donohue v. Baker, 976 F. Supp. 136, 145-46 (N.D.N.Y. 1997) (telephonic notice of charges at least three days prior to the hearing and written notice one day before the hearing "would seem [to be] sufficient").

### iii.   Limited Cross-Examination

Yu next argues that the proceedings were unfair because he was required to question the witnesses through Inoa, the IVP Chair, who "refused to ask many of [his questions directed at Complainant and Horowitz] and allowed [Complainant] to be non-responsive with crying and non-responsive answers." (Opp. at 17.) Yu claims that as a result, his cross-examination of the witnesses was "effectively denied." (Yu Decl. ¶ 28.)

As an initial matter, any claim of unfairness due to a requirement that questions be asked through the panel Chair fails as a matter of law. Courts have found that similar policies are procedurally adequate. See Donohue, 976 F. Supp. at 147 ("due process required that the panel permit the plaintiff to hear all evidence against him and to direct questions to his accuser through the panel"); see also Nash v. Auburn Univ., 812 F.2d 655, 664 (11th Cir. 1987) ("Appellants were told they could pose questions of the accusing witnesses by directing their questions to the presiding board chancellor, who would then direct appellants' questions to the witnesses. . . .

That they did not avail themselves of the opportunity to question the witnesses through the chan-
cellor cannot be characterized as a denial of process."). Moreover, the Dear Colleague Letter
specifically states that the Department of Education's Office for Civil Rights "strongly discour-
ages schools from allowing the parties personally to question or cross-examine each other during
the hearing." Dear Colleague Letter at 12.

To the extent Yu contends that he was denied effective cross-examination because Inoa
cut short his questioning, he has not established a genuine issue of material fact as to whether
this led to an erroneous outcome or was motivated by gender bias. Inoa testified in his deposi-
tion that in exercising his power to allow or disallow questions, he would cut off Yu's
questioning where answers to those questions had already been given and further questioning
would be redundant. (Bogdan Reply Decl. Ex. C at 80:9-25, 81:6-19, 82:4-12, 82:18-83:11,
84:10-18.) If the response was incomplete, and necessitated further questioning along similar
lines, Inoa would allow the additional questions. (Id. at 85:2-10.)

Notwithstanding his conclusory statement that Inoa "refused to ask many of my cross-
examination questions," Yu presents no evidence specifying which questions Inoa did not ask,
their relevance to the proceedings, whether they were redundant, or whether not asking them
may have prejudiced Yu in some way. (Yu Decl. ¶ 28.) In fact, a review of the hearing tran-
script shows that Yu was able to ask Horowitz (though Inoa) extensive questions about the
sufficiency of his investigation, (see Roellke Aff. Ex. A at VAS 1312-14 (Yu asking, for exam-
ple, "[w]hat is the evidence other than [Complainant's] own statement that she did not want to
connect with me?" and "[a]re these statements only provided by [Complainant] or are they sup-
ported by any other source?")), and was also able to ask Complainant about the Facebook
messages. (See Roellke Aff. Ex. A at VAS 1314-18 (Yu asking, for example, "[w]ho initiated

contact on March 20th on Facebook?" and "[w]ere you still in shock and denial when you initi-
ated the Facebook conversation?").) Further, aside from stating that this was so, Yu has adduced
no evidence substantiating his argument that Inoa "allowed [Complainant] to be non-responsive
with crying and non-responsive answers." (Opp. at 17.) Because Yu never specifies precisely
what questions he would have asked Complainant, what her "non-responsive answers" were,
how such responses prejudiced him, or how Inoa's conduct was motivated by gender bias, this
claim must fail.

### iv.    Horowitz Testified as a Fact Witness/Horowitz's Flawed Investigation

Yu also argues that the proceedings were unfair because Horowitz, Vassar's Title IX in-
vestigator, testified as a "fact witness with personal knowledge, which Horowitz did not have."
(Opp. at 17.) In so doing, "Horowitz's statement gave an official imprimatur on finding the ac-
cused guilty based on a treatment of the facts not based on percipient knowledge and reflecting a
biased investigation." (Id.)

To the extent that Yu bases his argument on due process standards regarding keeping the
roles of prosecutor, witness, and judge separate, see Tumey v. Ohio, 273 U.S. 510, 534 (1927),
as noted earlier, private colleges like Vassar are not bound by constitutional due process. Yu
points to no authority otherwise providing that Title IX prohibits a school's Title IX investigator
from testifying at the disciplinary hearing. Indeed, investigators have so testified in similar cir-
cumstances without a court taking issue. See Doe, 687 F. Supp. 2d at 754 ("the hearing panel
heard oral testimony from the hearing investigator"). In any event, Horowitz had no decision
making role in the outcome of the hearing, and there is no reason to believe that the panel mem-
bers could have confused Horowitz's testimony to be anything other than the statements of the

investigator – they were presented, after all, with his Investigator Report as part of the hearing file – rather than as a percipient witness with personal knowledge of the events.

Insofar as Yu is arguing that Horowitz's investigation itself was biased, this is largely conclusory and unsupported by the record.  Yu claims that the Investigator Report "(i) 'cherry pick[ed]' statements from each witness without providing their full context; (ii) took [Complainant's] statements as true; (iii) glossed over [Complainant's] unexplained inconsistencies; and (iv) framed the statements in a way that reflected his own biased decision that [Yu] was guilty." (Compl. ¶ 45.)  Yu points to no specific facts, however, to support these conclusory allegations.

A review of the Investigator Report shows that it lays out the events from both Yu's and Complainant's perspectives, and indicates which statements were made by whom.  (See, e.g., Horowitz Aff. Ex. F at VAS 423 ("She stated that . . ."; "She reported that . . ."; "Peter shared an account of . . . ."); see also Bogdan Decl. Ex. A at 26:19-21 (Yu agreeing in deposition that "the report had what she said and what you said, correct?").)  The Investigator Report summarizes and quotes from the Facebook exchanges, including the statements on which Yu relies.  (See Horowitz Aff. Ex. F at VAS 423 ("She stated that she 'had a wonderful time' during the evening of the incident with Peter and 'I will stand up for you . . . .'").[12]  The Investigator Report then goes on to explain the issues of "incapacitation," "consent," and "force" and break down how the factual issues involved in this case may fit into these administrative definitions.  (Id. at VAS 424-428).  The closest that Horowitz comes to injecting any sort of commentary into this recitation of facts and governing standards is when, in fleshing out the "incapacitation" issue, he states that

---

[12] Yu's assertion that Horowitz "did not mention those Facebook message in his report," (Opp. at 9), is thus clearly false.  Yu's additional contention that Horowitz should have included in his report that the Facebook messages "undermined" Complainant's version of events, which he acknowledged in his deposition (Lau Decl. Ex. 1 at 269:25-270:10), is unavailing because, as Horowitz himself put it, "[i]t's for the panel [not the investigator] to identify if the information undermines."  (Id. at 270:19-23.)

the information gathered "appears to suggest" that Complainant "may have made a series of decisions and exhibited behaviors to suggest that she was incapacitated prior to, and during, the incident." (Id. at VAS 425 (emphasis in original).) That this statement contains equivocating caveats suggests that no bias against Yu was either intended or realized. Indeed, Yu points to no specific portion or portions of the Investigator Report with which he takes issue. In his deposition, he refers to one sentence – which he could not remember, but that he said was with regard to Complainant "not want[ing] to leave with Peter" – that he claims was taken from Complainant but that was not put in quotes, and was thus misleadingly set forth as undisputed fact. (Bogdan Decl. Ex. A at 25:21-26:5.) No fair reading of the Investigator Report could lead a reasonable juror to conclude that this omission of quotation marks – wherever they were supposed to go – somehow rendered the document anything other than a summary of the events as told by the students involved, rather than one of undisputed fact.

Yu additionally argues that Horowitz's investigation was biased because he "refused" to call the two witnesses Yu had requested and noted only that he received emails from them, based on which he concluded that they would not provide useful testimony. (Compl. ¶ 50.) To the contrary, not only did Horowitz suggest that these witnesses be contacted,[13] but it was only after he did in fact reach out to both requested witnesses that he determined that they did not possess materially relevant information. (Horowitz Aff. Ex. I, J.) Yu points to no evidence that this finding was made in bad faith. With respect to Complainant's roommate, she could not remember whether she missed a call from Complainant on the night of the incident and could not

---

[13] As noted above, in an email exchange with Brown, Horowitz asked whether it was appropriate for the individuals Yu requested to serve as witnesses. (Horowitz Aff. Ex. G.) When Brown told him that it was up to him, Horowitz responded, "[l]et's invite them on in," indicating that "[m]y dominant concern is that he be given every opportunity to fully present his case." (Id.)

consult her phone log since she no longer had the same phone.  (Horowitz Aff. Ex. J.)  As for

Yu's roommate – who was unable to attend the hearing – the substance of what he could have

offered, as he stated in his email to Horowitz, was that he observed "Peter in bed with someone

else and he asked me to leave."  (Horowitz Aff. Ex. I at VAS 1121.)  Yu points to no other mate-

rial evidence that his roommate would have provided, and agreed in his deposition testimony that

there is no dispute that he and Complainant were in bed.  (Bogdan Decl. Ex. A at 37:17-21.)  To

the extent that Yu's roommate could have offered information regarding his perception of Yu's

drunkenness,[14] his observations would have been irrelevant given Vassar's reasonable person

standard.  As to the key issue of Complainant's incapacitation, Yu's roommate specifically said

that he could not be sure of her level of intoxication.  (Horowitz Aff. Ex. I at VAS 1120 (Yu's

roommate stating that he "assume[d] that [Yu] was intoxicated (and maybe the other person, but

I can't be sure of that")).)  In any event, Yu's roommates' observations were so fleeting that Hor-

owitz could have reasonably concluded that he could not contribute any additional, material

information to what was already part of the record.  There is thus no genuine issue of material

fact as to Horowitz's non-discriminatory reason for not compelling the roommates' appearances

at the hearing.[15]

Yu also claims that Horowitz's investigation was biased because he did not investigate

the witness' "potential biases or motives," even though the IVP relied on him to perform such

---

[14] Yu contends that Horowitz argued with his roommate about the level of Yu's intoxication.  (Opp. at 5.)
Yu mischaracterizes the record.  Yu's roommate had stated in his emails with Horowitz that he thought Yu was drunk
because of how quickly and forcefully he asked him to leave the room.  (Horowitz Ex. I at VAS 1120.)  Horowitz
followed up by asking, "couldn't he be forceful and very quick simply related to having someone in bed with him?
People get that way if they're walked in on, right?"  (Id.)  This is nothing more than a common sense follow-up
question, and cannot reasonably be interpreted as a gender-biased "argument" with Yu's roommate regarding Yu's
level of intoxication.

[15] To the extent that Yu also contends that Horowitz was biased in not including the roommates' emails in
the hearing file, that argument fails for the same reasons, i.e., the emails did not contain any additional information
that would have been material to the panel.

"background check[s]." (Pl.'s Suppl. Br. at 3.) To the contrary, when asked if he ever independently investigated potential biases or motivations by student witnesses, Horowitz stated that "[w]hen they become apparent or not necessarily even apparent, when they are even suggested during the course of the investigation for a student to come forward and say, Hey, I think she is misrepresenting this and this is why, we'll look into that. But we don't go fishing for them . . . ." (Lau Suppl. Decl. Ex. 2 at 252:25-253:13.) When asked at his deposition about Student B's statements in this case, Horowitz stated that there was no reason to question her credibility and that her account was consistent with Student A's and Complainant's. (Lau Decl. Ex. 1 at 230:23-231:6.) He further stated that "when it's brought to my attention, when it comes across as a misrepresentation or inconsistency with a story, I certainly call students on that and say, Here is what I am hearing from this individual, but it's not consistent with what you shared. But in this particular case there is nothing that she shared that suggested she had an agenda or she was misrepresenting. Everything, in fact, suggested that this was somebody who had credibility." (Id. at 231:7-17.)

Thus, while Horowitz did acknowledge that it was generally not his practice to automatically engage in an investigation of a witness' motivations or biases, (Lau Suppl. Decl. Ex. 2 at 253:14-16), he clearly stated that he does engage in such inquiries when there is a reason to do so. In Horowitz's view, there was no reason to do so here, and even if there were, Yu does not present any evidence that Horowitz failed to do so for discriminatory reasons.[16]

---

[16] Yu insinuates that Student B had "been in an intimate relationship with Yu . . . and had a motive to interrupt [Complainant] from starting an intimate relationship with Yu." (Opp. at 3.) Yu could have raised this issue with Horowitz, and indeed had an opportunity to address it when Student B was questioned at the hearing, but there is no indication in the record that he ever sought to do so. (See Roellke Aff. Ex. A at VAS 1320-1322.)

Finally, Yu attempts to discredit Horowitz's investigation by contending that oversight of Horowitz and the investigatory process is insufficient. Yu asserts that Horowitz was not adequately trained; that there is "no substantive audit" of Horowitz's compliance with Title IX; that Horowitz "had only been an investigator for Vassar . . . [for] less than one . . . year from the date of the [h]earing"; and that Julian Williams, Horowitz's supervisor, does not "double-check" Horowitz's work. (Pl.'s Suppl. Br. at 5.) Each of these claims is either unsupported by the record and/or does not raise any issues of material fact that would show Vassar discriminated against Yu based on his gender.

As to Horowitz's training, Yu points to Williams' deposition testimony, wherein he stated that Title IX requires "annual training" but it "doesn't specifically set out what that training would look like or from who." (Lau Suppl. Decl. Ex 6 at 15:24-16:3.) Yu does not explain how attending annual trainings (or only annual trainings) as described somehow violates Title IX. Moreover, Yu presents no evidence that the training Horowitz detailed in his own deposition testimony is insufficient under Title IX. (See Bogdan Reply Decl. Ex. B at 7:14-16:3, 25:10-36:25, 101:14-102:24; 107-11-111:12, 112:6-14.) Similarly, Yu does not explain how the fact that Horowitz had been an investigator for less than one year by the time of the hearing prejudiced Yu or otherwise rendered the investigation flawed.

Further, contrary to Yu's contention that there is no substantive audit of Horowitz, Williams testified that he and Horowitz, "as well as other investigators, will meet frequently to talk about our processes, our procedures, what we are doing, what they are doing in cases. So I would see that as a specific type of audit and review." (Bogdan Suppl. Decl. Ex. B at 64:15-20.)

While Williams did acknowledge that he does not provide a "second opinion" or check over each piece of information gathered by Horowitz, (Lau Suppl. Decl. at 60:24-61:6), he also

30

stated that he conducts a "holistic review" by "looking at the facts, how they are stated, is the information clear . . . is there enough information there to give the panelists or is there too much information there." (Bogdan Suppl. Decl. at 56:13-57:4.) Yu offers no authority suggesting that this is insufficient under Title IX, or that any deficiencies, if they exist, were motivated by gender bias.

Yu is therefore unable to establish that Horowitz's testimony or investigation contributed to a flawed disciplinary proceeding.

### v.    No Sworn Testimony

Next, Yu argues that the procedures were flawed because "hearing statements were not sworn . . . ." (Opp. at 17.)

Yu has cited no authority for the proposition that Title IX requires sworn testimony at a school disciplinary proceeding, where the school's procedures expressly state that witnesses will not be placed under oath. (Bogdan Decl. Ex. C at 23 (IVP proceedings "are administrative hearings, not trials. No one is placed under oath at hearings.").) Particularly since Yu was able to ask the witnesses questions through Inoa, the admission of unsworn testimony at the hearing does not mark the proceedings as flawed, much less gender-biased. See Rensselaer Soc'y of Eng'rs, 689 N.Y.S.2d at 295 (disciplinary proceedings at private university "do not implicate the full panoply of due process guarantees" (internal quotation marks omitted)); cf. Sampson v. Dist. Council of New York City and Vicinity of United Bhd. of Carpenters and Joiners of Am., No. 10-CV-8120-LAP, 2012 WL 4471535, at *6 (S.D.N.Y. Sept. 27, 2012) (rejecting due process claim under the Labor-Management Reporting and Disclosure Act where plaintiff "fail[ed] to show how [the statute] require[d] that witnesses be placed under oath or how his accuser's providing unsworn testimony deprived him of due process").

###### vi.    Presumption of Male Guilt

Yu contends that the "panel members took the accusatory testimony of [Complainant],

Students A and B and the Student Fellow at face value, effectively using a presumption of male

guilt that negated . . . [the] preponderance of evidence burden of proof." (Opp. at 17.) Yu is es-

sentially arguing that the panel did not properly assess the credibility of the witnesses. In

particular, he contends that they accepted the testimony of Student A and Student B despite the

two witnesses being "demonstrably[] not competent to testify." (Pl.'s Supp. Br. at 2.)

This contention is unsupported by the record. Jamie Kelly, one of the panelists, testified

in his deposition that the IVP relied on Student A's and Student B's testimony to corroborate

Complainant's claim of incapacitation: "We had testimony from two individuals who believed

her to be very drunk. We had her own account of the evening, which said that she was very,

very drunk. That all seemed coherent in a way that made it credible." (Lau Suppl. Decl. Ex 5 at

112:20-24.) Yu argues, however, that "the [p]anel did not question [Student B] or [Student A]

about their definition of 'very drunk,' even though Mr. Kelly admitted that one person's defini-

tion of 'very drunk' can vary from another's." (Pl.'s Suppl. Br. at 3; Lau Suppl. Decl. Ex. 5 at

70:8-71:3.) This fact, Yu argues, along with the fact that the panel did not ask whether Student

A or Student B had ever seen Complainant intoxicated, is evidence that the panel "did not chal-

lenge [Student B] or [Student A's] statements and took them at face-value." (Pl.'s Suppl. Br. at

3; Lau Suppl. Decl. Ex. 5 at 110:12-18, 111:8-10.) This argument fails.

In a judicial proceeding under the Federal Rules of Evidence, "[t]here is near universal

agreement that lay opinion testimony about whether someone was intoxicated is admissible . . .

." United States v. Horn, 185 F. Supp. 2d 530, 560 (D. Md. 2002). The Federal Rules do not re-

quire a specific definitional breakdown of the components of intoxication, nor past familiarity

with an individual's drunken habits, but merely a direct statement, "assuming adequate observation and common experience," that the person "seemed drunk . . . ." Id. (the witness is "not confined to descriptions of glazed eyes, problems in speech or motor coordination, changes in behavior or mood or affect, but may say directly . . . that the person seemed drunk or under the influence" (quoting Mueller and Kirkpatrick, Evidence § 7.4 (4th ed. 1995)). Yu gives no reason why a school disciplinary proceeding would be held to a higher evidentiary standard than a federal court proceeding, nor why the only witnesses competent to testify as to drunkenness are those who are familiar with a particular person's drunkenness, or why commonplace testimony as to intoxication could not be accepted as credible but for gender bias.

Indeed, in his deposition, Kelly further stated that the panel did not further question the witnesses about their familiarity with levels of intoxication because "one could make that kind of determination in general . . . . [Y]ou . . . rely on sort of general traits and characteristics about how people behave when they are drunk. . . . [T]here will be aberrant cases, alcoholics that have high functioning while intoxicated, for example. But that doesn't diminish the fact that it's generally possible to make some judgments about an individual's level of intoxication." (Lau Suppl. Decl. Ex 5 at 110:23-112:2.) Moreover, as mentioned above, in assessing the witnesses' credibility, Kelly testified that the panel "weigh[ed] all the different information . . . available to [it.] . . . We had testimony from two individuals who believed her to be very drunk. We had her own account of the evening, which said that she was very, very drunk. That all seemed coherent in a way that made it credible." (Id. at 112:6-24.) Similarly, Harvey stated that, to assess witness credibility, panelists would ask clarifying questions of the witnesses and/or point out inconsistencies between their testimony and their prior written statements or the testimony of other witnesses. (Bogdan Reply Decl. Ex. A at 43:12-46:5.) Regarding the witnesses in this particular

33

case, Harvey stated that "part of the process is to look at consistency of witness statements and . . . the witness statements seemed very consistent." (Id. at 99:20-23.)

Yu can point to no evidence in the record demonstrating that the panelists accepted the testimony regarding Complainant's incapacitation for discriminatory reasons. Yu's most compelling argument – that the testimony of incapacitation (and force alleged) is contradicted by the Facebook messages Complainant exchanged with Yu after the incident – nonetheless does not give rise to any inference of gender bias. The Facebook messages will be discussed below.

There is thus no evidence to support Yu's contention that the IVP displaced the preponderance standard with a presumption of male guilt.

### vii.    Inadequate Written Decision

Yu contends that due process requires a "detailed factual finding in the college's disciplinary determination . . . ." (Opp. at 18.) In entirely conclusory fashion, Yu argues that because the IVP Written Findings "consist[] of a few bullet points as to the result and what was considered" with "no explanation" given, it is "inadequate." (Id.) This argument fails.

The case cited by Yu for his proposition regarding due process requirements pertains specifically to "public institution[s]" and thus has no bearing on the issue here. Boyd v. State Univ. of New York at Cortland, 973 N.Y.S.2d 413, 415 (3d Dep't 2013). Indeed, the Dear Colleague Letter provides that, to comply with Title IX, a school must provide notice of the outcome of the disciplinary proceeding to the complainant and the respondent, "i.e., whether harassment was found to have occurred." Dear Colleague Letter at 13. There is no mention of any detailed written finding. Moreover, as the Dear Colleague Letter points out, postsecondary institutions are subject to the Clery Act, which requires that "[b]oth the accuser and the accused must be informed of the outcome of any institutional disciplinary proceeding brought alleging a sex

offense," and defines "outcome" as "only the institution's final determination with respect to the alleged sex offense and any sanction that is imposed," with no requirement of a detailed factual finding. Dear Colleague Letter at 14; 34 C.F.R. § 668.46(b)(11)(vi)(B). In any event, even if a detailed factual finding were required, and even if the IVP Written Findings fell short of such a requirement, Yu points to no evidence suggesting that failure to present such a writing to Yu was motivated by gender bias.

Relatedly, Yu argues that because he was not provided with the IVP Written Findings or a transcript of the hearing and because Vassar policy limits the grounds on which appeal may be based, "there was no meaningful right of appeal." (Opp. at 18.) Yu provides no legal authority for this contention, and points to no evidence showing how he would have more effectively appealed his case if these purported obstacles were not in his way or how these purported procedural flaws were motivated by gender bias.[17]

### b.  Vassar's Compliance With its Own Procedures

Aside from the foregoing claims of procedural error, Yu also argues that the proceedings were flawed because Vassar failed to comply with its own procedures. While reasonable minds may differ as to what a school's sexual misconduct policies should provide, there is no genuine factual issue here as to whether Vassar adhered to its own regulations.

### i.  Training of IVP Panelists

Yu argues that while Vassar College Regulations provide that panelists will have received specialized training with respect to sexual misconduct and harassment, the panelists here

---

[17] Yu also mentions that an audio recording of the proceeding was inaudible. (Opp. at 11; Leonard Decl.) Again, Yu provides no evidence as to how this affected his right of appeal, what impact if any it had on his appeal, how or why this renders proceedings deficient under Title IX, or how this was motivated by gender bias.

"testified that they attended only a few hours of sessions and did not remember any of the training . . . ." (Opp. at 18.)

The Regulations provide that "[p]anelists will have received specialized training with respect to [sexual misconduct, stalking, and other similar incidents involving assault or violence]." (Yu Decl. Ex. L at 173.) Yu points to nothing in the record suggesting that "a few hours of sessions" is somehow inconsistent with Vassar's understanding of "specialized training" or that failure to remember certain specifics about the training at a later date is in violation of the Regulations. To the contrary, the record indicates that the panelists all received training, which is all that the Regulations provide for. (Bogdan Reply Decl. Ex. D at 11:5-18 (Parker testifying that she has received training and that it consists of ongoing workshops and clinics); Bogdan Reply Decl. Ex. A at 9:12-10:3 (Harvey testifying that she has received training, which consisted of "a series of Title IX related training workshops"); Bogdan Suppl. Decl. Ex. A at 20:16-21 (Kelly testifying that he was "trained to recognize the difference between incapacitation and intoxication").)

### ii. Provision of Written Decision for Appeal

Yu contends that the College Regulations provide that the IVP decision may be appealed within five days of receiving the written decision, but that the written decision was never provided to Yu. (Opp. at 19.)

The Regulations provide that "[t]he decision of the [IVP] may be appealed by petitioning the College Regulations Appeals Committee chaired by the dean of the college . . . within five (5) business days of receiving the written decision for a review of the decision or the sanctions imposed." (Yu Decl. Ex. L at 173.) Yu's argument appears to be premised on the assumption that the "written decision" he was entitled to was the IVP Written Findings, rather than simply a

36

notice of the outcome of the hearing and the sanctions imposed.  There is no support for this as-
sertion.

Instead, it is undisputed that Yu did in fact receive a written decision, in the form of an
email from Brown dated March 8, 2013, informing him of the outcome of the hearing and the
sanctions imposed.  (Brown Aff. Ex. D.)  In a formal letter from Brown sent the same day and
providing almost exactly the same information, it is made plain that "[l]etters of appeal must be
filed within 5 days of the receipt of this letter," which indicates that the "written decision" re-
ferred to in the College Regulations is simply a writing notifying the student of the outcome of
the hearing and sanctions, nothing more.  (Yu Decl. Ex. G.)  Moreover, Yu himself appears to
have been aware that the "written decision" referred to in the College Regulations was the
emailed sanctions notice.  In an email to Roellke, dated March 9, 2013, Yu says that "I have re-
ceived a unofficial sanction notification via email by Dean Brown on this Friday [March 8].
Does it mean you would need the appealing letter by March 15th?"  (Roellke Aff. Ex. B at VAS
1328.)  Roellke responded on the same day, stating that "I am able to receive this appeal no later
than Monday, March 18."  (Id.)  While the five-day timeframe appears to have been extended
here, there is no question that Yu himself understood receipt of the written notice of sanctions –
not the IVP Written Findings – as the document triggering his timeline to appeal.  His argument
now that he was never provided the IVP Written Findings in violation of the College Regulations
is thus meritless.[18]

------

[18] In a related argument in his Complaint, Yu states that Vassar violated its "Formal Grievance Process"
because it failed to provide him with "a written summary prepared by the chair of the Grievance Hearing Panel on the
basis of the Panel's judgment within three working days after the deliberations have been completed." (Compl. ¶ 61.)
As Vassar points out, the referenced provision of the College Regulations relates to procedures before a "Grievance
Hearing Panel," which determines "whether a faculty member, administrator, or staff member has violated Vassar's
nondiscrimination and non-harassment policy," not the IVP procedures at issue here. (Def.'s Br. at 17; Yu Decl. Ex.
L at 169, 115.) This claim therefore fails.
    In addition to this "written notice" claim, Yu makes another allegation in his Complaint based on this erro-
neous understanding of the College Regulations. Yu argues that the IVP failed to include an "examination of those

### iii.   Sanction Imposed

Yu asserts that the IVP violated the College Regulations by expelling him despite his submission of "three character statements on his behalf and his impact statement, his having no prior history of sexual misconduct on his disciplinary record and there being precedent of another student found 'responsible' of the same charges, just three months earlier . . . and only receiving a one-term suspension." (Opp. at 19 (emphasis in original).)  These arguments do not defeat summary judgment.

The College Regulations provide that the IVP "shall recommend a sanction in accordance with factors such as the nature and seriousness of the offense, the motivation underlying the offense, the impact upon the campus community, precedent in similar cases, and/or the student's disciplinary record." (Yu Decl. Ex. L at 175.)  The Vassar College Student Conduct Sanctioning Parameters provide that sanctions for violations of Section 5.05 of the Regulations range from probation to expulsion; sanctions for violations of 20.2 range from suspension to expulsion. (Brown Aff. Ex. B.)  It therefore cannot be disputed that Yu's expulsion is within Vassar's sanctioning parameters.  The mere fact that Yu submitted impact statements and had no prior sexual misconduct on his disciplinary record, while factors for the IVP to consider, does not necessitate a lesser sanction, nor does it raise any inference of gender bias.  In fact, the precedent that Yu submitted of a lesser sanction involved a male respondent. (Bogdan Decl. Ex. A at 90:10-16; Yu Decl. Ex. O.)  The fact that another male student was suspended for the same offenses as Yu

---

witnesses and receipt of such documentary evidence as the panel may deem appropriate." (Compl. ¶ 60; Yu Decl. Ex. L at 114.)  While the content of this allegation is raised in other contexts on this motion and discussed elsewhere in this Opinion, the precise language quoted by Yu also refers to the Grievance Hearing Panel, not the IVP.

while Yu was expelled does nothing to raise an inference of gender bias with regard to the sever-ity of the sanction.[19]

### iv.    Right to Arrange for the Presence of Witnesses and to Ask Questions at the Hearing

The College Regulations state that the respondent in a disciplinary action has "[t]he right to have the college arrange the presence of student, faculty, staff, or other relevant witnesses, and the opportunity (if desired) to ask questions, directly or indirectly, of witnesses present . . . and the right to challenge documentary evidence . . . ." (Yu Decl. Ex. L at 181.)  In a reprise of ear-lier arguments, Yu contends that, contrary to these rules, he was "not given the right to ask questions and the panel [C]hair did not ask many of the questions that Yu had listed" and Horo-witz did not make available the two witnesses Yu had requested.  (Opp. at 19.)

As stated above, Yu was given – and exercised – his right to ask questions of the wit-nesses through Inoa.  Yu points to no Regulation that prohibits the panel Chair from overseeing the questioning as he did.  Indeed, the Regulations provide that the respondent has a right to "ask questions, directly or indirectly, of witnesses present . . . ."  (Yu Decl. Ex. L at 181 (emphasis added).)

Also as stated above, the two witnesses that Yu had requested could not attend the hear-ing and did not possess material evidence to offer in any case.  Yu does not identify any

---

[19] To the extent that Yu bases his argument on the contention that "[t]he panel members could not explain why the penalty was severe in Yu's case," that argument fails. (Opp. at 11.) He cites to Inoa's and Harvey's deposi-tions as evidence of the purportedly arbitrary or biased nature of the sanction, but those depositions support the opposite conclusion. Inoa stated that the panel considered Yu's mitigating submissions but that it was "not enough to move away from expulsion." (Lau Decl. Ex. 5 at 131:13-24.) Additionally, he stated that the panel based its expulsion decision on the "safety of the student, safety of the community . . . the safety for [Complainant]," as well as the fact that Yu was "not remorseful." (Bogdan Reply Decl. Ex. C at 117:9-118:12.) As for Harvey, she stated that past precedent and character statements "give[] context and nuance and informs on sanctions and deliberations" and that the panel must "weigh[] all of the pieces in sanctioning." (Lau Decl. Ex. 3 at 150:7-153:3.) This testimony shows that Yu's submissions provided information that was considered, but that they did not necessarily dictate a lesser sanction. Critically, there is no suggestion that the decision to expel Yu was motivated by gender bias.

Regulation that provides that witnesses who otherwise cannot attend the hearing, or whose testimony would yield no additional material information, must be compelled to appear.

<strong>v. Outcome Based on Evidence That is Credible and Based in Fact</strong>

The College Regulations provide that the respondent has a right to an "outcome based solely on evidence presented during the conduct process. Such evidence shall be credible, relevant, based in fact, and without prejudice . . . ." (Yu Decl. Ex. L at 181.) Yu argues that the Student Fellow was "allowed to opine about whether Yu looked drunk (taken at face value) . . . ." (Opp. at 19.) The issue of lay witness testimony as to a person's drunkenness is discussed above, and the argument here fails for the same reasons.[20]

Yu also argues that, in light of the Facebook messages, Complainant's "statement[s] had obvious credibility problems." (Opp. at 19.) The IVP's consideration of the Facebook messages, Complainant's statements, and its weighing of the evidence will be discussed below.

In sum, Yu has failed to raise a genuine issue of fact as to whether Vassar violated its own procedures, or whether the disciplinary proceeding was otherwise procedurally flawed.

### 2. Gender Bias in the IVP Decision

Even if the proceeding was flawed in some fashion, Yu has failed to provide any evidence suggesting that the outcome was born out of gender bias, as he must in order to prevail under Title IX. Scott, 2011 WL 5082410, at *4 (plaintiff must show that "gender bias was a motivating factor behind the erroneous finding" (quoting Yusuf, 35 F.3d at 715)). Gender bias in a Title IX action may be shown by evidence such as "statements by members of the disciplinary

---

[20] To the extent that Yu also means to argue here that the IVP failed to assess the credibility of Students A and B and took their statements at "face value," that argument fails for the reasons discussed above.

tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Yusuf, 35 F.3d at 715.

The record here is devoid of any evidence of gender bias. Yu has not provided, for instance, any statements made by IVP members, nor any statements made by any other Vassar official, that would evidence any sort of discriminatory intent. Yu has similarly failed to provide any statistical evidence that "males invariably lose" when charged with sexual misconduct at Vassar. See id. at 716 (concluding that, on a motion to dismiss, a claim that "males invariably lose when charged with sexual harassment at Vassar" was sufficient to allege a causal connection between the erroneous outcome and gender bias).[21] Yu's attempt to identify a "pattern of decision-making" on Vassar's part by citing to Yusuf, which also involved Vassar, also fails. One twenty-year-old decision allowing a complaint to survive a motion to dismiss does not establish a pattern of discriminatory conduct by Vassar. See Mallory v. Ohio Univ., 76 Fed. App'x 634, 640 (6th Cir. 2003) (one claim filed six years ago "by an individual who was subjectively dissatisfied with a result does not constitute a 'pattern of decision-making'")

### a. Facebook Messages

With no discriminatory statements, patterns of discriminatory conduct, or statistical evidence to rely on, Yu instead argues that "[w]ithout anti-male gender bias, [Complainant's] unsworn statement of non-consensual sex simply lacked credibility" when viewed in light of the Facebook messages, and therefore any disciplinary decision based on Complainant's statements must have been biased. (Opp. at 20.) The Court disagrees.

---

[21] Indeed, Horowitz testified at his deposition that another student had been found not responsible in another alcohol-related sexual misconduct case with a female complainant. (Bogdan Reply Decl. Ex. B at 86:14-87:8.) The sex of the respondent in that case is not specifically stated in the deposition excerpt submitted to the Court, although Vassar states in its brief that the respondent was male. (See Reply at 9.)

Yu is correct that the Facebook exchanges could be deemed to contain exculpatory information. The day after the incident, Complainant wrote to Yu, "I'm really sorry I led you on last night," "I had a wonderful time last night I'm just too close to my previous relationship to be in one right now," and "I will stand up for you because you were not [hurting anyone]." (Yu Decl. Ex. A at 4, 5.) Indeed, Horowitz stated in his deposition that the Facebook messages could "undermine" Complainant's position. (Lau Decl. Ex. 1 at 270:2-10.) At the hearing, Complainant explained that those statements "[did] not reflect any truth of how [she] felt that day because [she] was just trying to cope." (Roellke Aff. Ex. A at VAS 1317.) As to the messages she sent Yu one month later, wherein she stated, among other things, that she "wanted to . . . apologize for that night," she stated at the hearing that she had heard that Yu was upset and was "trying to make amends." (Id.) She said that she was "trying to make sure [she] was on good terms with all [her] teammates." (Id.) When Yu asked her if she was "still in shock and denial when [she] initiated the Facebook conversation," she replied that she was "less shocked because [she] had some time, but over all, yes." (Id.) Horowitz's Investigator Report also mentioned that Complainant had stated that "she said these things at the time because she was 'in denial,' 'extremely scared' and in a state of 'shock and disbelief'" and that "the exchange did not correctly reflect her feelings." (Horowitz Ex. F at VAS 423.) [22]

The record contains conflicting statements regarding the extent to which these Facebook messages were considered by each of the IVP members. The IVP Written Findings themselves

---

[22] In its briefing, Vassar argues that, in any event, the Facebook messages were incriminating because Yu acknowledged Complainant's incapacitation in a message to her: "I was so drunk I didn't know what i was doing. I am sure that's the case for you as well." (Def.'s Br. at 13; Yu Decl. Ex. A at 8.)

are ambiguous on that point: "Facebook chat" is listed under "Information that was NOT considered in reaching a decision regarding responsibility," but is then crossed out, suggesting that they were in fact considered. (Inoa Aff. Ex. A at VAS 377.)

With regard to the panel members' deposition testimony, Kelly testified that the Facebook messages "seemed so relevant. It seemed to be germane. So I don't know why it wouldn't be considered. . . . They had to do with statements about the night in question by the two people involved." (Lau Suppl. Decl. Ex. 5 at 93:24-94:6.) When asked why, in that case, he did not consider the Facebook messages exculpatory, he said that it was because Complainant had stated that she wrote those messages as a way to cope with what had happened, that she was "shocked . . . and was just trying to find a way to get through it . . . ." (Bogdan Suppl. Decl. Ex. A at 96:20-23, 130:16-18.) Kelly testified that this explanation "seemed to conform to her account of what transpired that evening," (id. 96:20-21) and that, "in conjunction with all the [testimony of the other witnesses], [he] found her credible." (Id. 130:22-23.)

When Harvey was asked what impact the Facebook messages had on the panel, she responded, "I can't . . . answer that question because I know the panel recommendations that was crossed out and I can't recall what the context was." (Lau Decl. Ex. 3 at 105:11-14.) Later, when asked if "sitting here today" the Facebook messages would have any impact on her decision making, Harvey stated, "The Facebook messages appeared after the incident. And we as panelists are tasked with working through the incident and what led up to the incident." (Id. at 123:8-12.) Harvey acknowledged that the Facebook messages did address the night in question and "points to the degree of alcohol use," but reiterated that the panel was tasked with "asking about incapacitation and if the reasonable person standard did apply," suggesting that the Facebook messages were of less probative value relative to the other evidence presented on this key

43

issue.  (Id. at 124:3-14 ("But all of the witness statements and the investigator statement and the

complainant and the respondent's statements also deal with, or engage with, the specifics of that

night.").)

When Inoa – who was the IVP Chair but not a voting member – was asked if the Face-

book messages played any role in the panel's determination of incapacitation that evening, he

responded that he "cannot recall, but . . . . Because it came after it wasn't something that was part

of the deliberation." (Lau Decl. Ex. 5 at 95:20-23.) He further stated that:

> [t]he Facebook messages weren't a major factor in that deliberation process, in
> determining whether . . . [Complainant] was incapacitated at the time of the inci-
> dent. The Facebook messages played no role in that. . . . I can't recall how much
> time, or if any time, was given to the nature of the Facebook messages. There
> might have been questions during the hearing but I can't recall what they would
> have been for sure.

(Id. at 97:8-98:5.)  When read passages of the exchange that clearly referred to the night in ques-

tion, Inoa acknowledged that the messages did in fact relate to the incident, even if written

afterwards.  (Id. at 99:6-100:8.)

Although the IVP members' memories of the treatment of the Facebook messages dif-

fered, all (aside from Parker, whose deposition testimony on this subject, if any, was not

provided) acknowledged having them discounted to some extent.  It cannot be disputed, how-

ever, that the Facebook messages were before them as part of the hearing file (Def.'s 56.1

Statement ¶ 23), that Complainant gave statements as to why she wrote them as she did (Horo-

witz Ex. F at VAS 423; Roellke Aff. Ex. A.), and that Yu, through Inoa, questioned her about

them at the hearing.  (Roellke Aff. Ex. A.)  That the panelists, despite the Facebook messages,

credited Complainant's version of events – and found her incapacitation corroborated by other

witnesses – is insufficient to defeat summary judgment.  The panel was not required to conclude

that the messages exculpated Yu in light of the other evidence presented, and were free to credit

Complainant's explanation of the messages, as Kelly explicitly stated that he did. Absent some indication that the panelists' treatment of the Facebook messages was motivated by gender bias, the Court cannot second-guess the IVP's credibility determinations and overall evaluation of the evidence.

Aside from broadly stating that "the [p]anel was wrong" to discount the Facebook messages, Yu points to no evidence suggesting that such discounting was due to gender bias. (Pl.'s Suppl. Br. at 6.) Yu argues that gender bias is the only explanation for how the IVP could have believed Complainant's version of events given the Facebook messages, (Opp. at 20), but this ignores the corroborating testimony of Student A and Student B as to Complainant's incapacitation, (see Kelly Aff. ¶ 7 ("other witnesses corroborated [Complainant's] testimony concerning her level of intoxication."),[23] as well as Complainant's own explanation for writing the Facebook messages. Yu's assertion that Complainant's statements "simply lacked credibility" (Opp. at 20) and that the IVP "inexplicably" gave more weight to Student A's and Student B's testimony than the Facebook messages (Pl.'s Suppl. Br. at 2) does not change this determination. As discussed above, it is beyond the Court's purview to second-guess the weight the IVP afforded individual pieces of evidence and the credibility determinations that it made; rather, the Court's role is to consider whether these determinations were motivated by gender bias, and Yu has failed to point to any evidence that that was the case. That Yu disagrees with the IVP's consideration of the evidence is not grounds for the Court to find the IVP's decision to be in violation of the law. Absent any other evidence of discriminatory motivation, Yu has simply failed to raise any triable

---

[23] Yu's argument that Student A's and Student B's testimony "did not rehabilitate" Complainant's statement of non-consensual sex because they were not in the room where the sex occurred and because they "were slow enough in getting to Yu's dorm" is meritless. (Opp. at 21.) First, according to the panelists, Student A's and Student B's testimony was not relied on for what actually occurred inside Yu's room, but only for their observations of Complainant's drunkenness. (See Bogdan Suppl. Decl. Ex. A at 69:17-19 (Kelly testifying that "the stuff about incapacitation and intoxication is what I took away from [their statements]").) Second, Yu provides no reason for why the speed with which Student A and Student B arrived at Yu's dorm has any bearing on their credibility.

issue of fact that the IVP was unlawfully biased in its consideration of the Facebook messages and its ultimate reliance on Student A's, Student B's, and Complainant's statements. See Brown, 663 F. Supp. 2d at 403 (allegations that the college "ignored certain evidence and accepted other evidence unquestioningly" was insufficient to plead discriminatory intent because "there are many possible explanations for this" other than discriminatory bias).

### b. Reasonable Person Standard

Yu also argues that Vassar operated on a "double standard" because its regulations did not consider the male student's level of intoxication in deciding whether a reasonable person knew or should have known of the female student's incapacitation. (Opp. at 17; Pl.'s Suppl. Br. at 8-9.)[24]  Although there may well be a double standard regarding how the school considers the intoxication levels of a complainant and a respondent, it is not based in gender.

Contrary to Yu's assertions, nowhere in the email that he cites does "Vassar's President . . . recognize[] that when two students are drunk, only the female is considered incapable of giving consent . . . ." (Opp. at 17; see Lau Decl. Ex. 8.)  To the extent that Yu is referring to the March 21, 2013 email written by Vassar's President, Catharine Hill, what she says is, "It is very scary, though.  Two drunk kids, both out of it.  Is it always the male at risk?" to which Roellke

---

[24] In his Notice of Supplemental Authority, Yu submits a Wall Street Journal article in order to highlight the unfairness of Vassar's "double standard," but if anything, that article may actually support Vassar's position. (Notice of Suppl. Auth. (James Taranto, The Other Side of Title IX, Wall St. J. (Apr. 28, 2014), http://www.wsj.com/articles/SB10001424052702304393704579529714129190136).)  The article discusses how Brett Sokolow, director of the Association of Title IX Administrators, has criticized policies where "intoxication creates an inability to consent," because in many "drunken hook-up[]" cases, "the accuser has violated the letter of the policy as much as the accused has[:] If both are intoxicated, they both did the same thing to each other . . . . Why should only the male be charged if both students behave in ways defined as prohibited by the policy?" (Id. (internal quotation marks omitted).)  A more sensible policy, in Sokolow's view, is one which requires that the accuser be incapacitated, not merely intoxicated, and that the accused "know[s] or should have known" of the accuser's incapacitation. (Id.)  This objective, reasonable person standard with respect to incapacitation is the precise policy that Vassar has promulgated. (See Yu Decl. Ex. L at 125-26 ("Consent cannot be gained by . . . taking advantage of the incapacitation of another, where the accused knows or should have reasonably known of such incapacitation. . . . Consumption of alcohol or drugs alone is insufficient to establish incapacitation."); Bogdan Suppl. Decl. Ex. A at 20:17-19 (Kelly testifying that in determining whether consent was given, IVP panelists "are trained to recognize the difference between incapacitation and intoxication").)

replies, "She was drunk. He wasn't according to the panel." (Lau Decl. Ex. 7.) While Hill's remark questions whether male students are more likely than female students to be the accused in sexual misconduct cases, neither her statements nor Roellke's response suggest any sort of intentional gender bias.

Indeed, Vassar's policy toward incapacitation and the reasonable person standard is entirely gender neutral. The College Regulations provide that "[c]onsent cannot be gained by . . . taking advantage of the incapacitation of another, where the accused knows or should have reasonably known of such incapacitation." (Yu Decl. Ex. L at 125.) The Regulations go on to state that "[t]he question of incapacitation is determined on a case-by-case basis. It will include an analysis of whether the accused knew, or a sober, reasonable person in the position of the accused should have known, that the complainant was incapacitated." (Id. at 126.)[25] Yu's argument that his own intoxication was "relevant to whether he knew or should have known that [Complainant] was incapacitated since his own judgment was clouded that evening" ignores the plain language of the rules, which provide that a "sober, reasonable person" standard applies. (Pl.'s Suppl. Br. at 8.) And Yu has never claimed that he was incapacitated.

The deposition testimony is consistent with this gender-neutral rule. Williams testified that "the voluntary intoxication[] by the respondent typically isn't a factor that the panelists are concerned with. They are specifically trained to look at and exam[ine] the level of intoxication

---

[25] To the extent that Yu argues that the panel did not "engage[] in any meaningful inquiry into whether [he] knew or should have known that [Complainant] was incapacitated" because they "ignored" his testimony as to Complainant calling her roommate to check on the availability of her room, and Complainant's undressing herself and performing oral sex on him, among other things, Yu's argument also fails. (Pl.'s Suppl. Br. at 7.) Kelly, in his deposition testimony, explicitly addressed these issues and explained how, while they were considered, none of them necessarily showed that Complainant was not too incapacitated to give consent, but that Yu or a reasonable person should not have known she was so incapacitated, or that Yu's testimony should be credited over the other witnesses', all of whom testified about Complainant's high level of intoxication. (See Lau Suppl. Decl. Ex. 5 at 159:2-166:16, 114:7-11; see also 112:6-24.) Ultimately, Yu has not pointed to any evidence showing how or why this determination was motivated by gender bias.

47

versus incapacitation for the complainant and not the respondent." (Lau Suppl. Decl. Ex. 6 at
83:4-10; see also Bogdan Reply Decl. Ex. B at 101:16-19 (Horowitz testifying at deposition that
the training sessions made "clear at the outset . . . that [sexual misconduct] can be male/male, fe-
male/female, male/female"); Bogdan Reply Decl. Ex. A at 61:14-17 (Harvey testifying at
deposition that "[w]e are asked to follow a reasonable person standard. So would a reasonable
person have known or could have known that the individual, male or female, could have given
consent?").) There is simply no indication anywhere in the record that this policy was under-
stood to apply on a gendered basis.

A similar argument was rejected in Mallory v. Ohio University for reasons that are appli-
cable here. In that case, the male plaintiff, Mallory, argued that the defendant university's "focus
on [the female complainant's], but not Mallory's, ability to consent . . . reveals that the Univer-
sity holds an antiquated notion that 'men are sexual aggressors and women are victims.'"
Mallory, 76 Fed. App'x at 639. The Sixth Circuit held, however, that "the University's decision
to focus on the ability to consent merely demonstrates the University's policy decision to punish
those who engage in sexual conduct with another person when the first person is aware of the
other's inability to consent. . . . [T]here is no evidence that this interpretation was discriminato-
rily applied or motivated by a chauvinistic view of the sexes." Id. Likewise here, Yu has
presented no evidence that Vassar's policy was discriminatorily applied or motivated by gender
bias.[26]

---

[26] While it is true that Vassar's sexual misconduct policies and procedures may have a disproportionate effect
on male students (see Lau Suppl. Decl. Ex. 6 at 85:13-17 (Williams stating that he has never seen a rape case at Vassar
involving a male complainant and female respondent)), as they may at other colleges, Yu, as discussed above, has not
asked the Court to consider a disparate impact theory of liability. Instead, Yu is clear that he is claiming solely that
Vassar intentionally discriminates against males. (See, e.g., Pl.'s Suppl. Br. at 9 ("Based on the fact that, invariably,
sexual misconduct charges are filed by female students against male students . . . combined with the double standard
applied to the analysis of alcohol use and intoxication . . . Plaintiff has raised an issue of fact regarding Vassar Col-
lege's outright sex discrimination against male students in violation of Title IX.") (emphasis added); Compl. ¶ 83
("Vassar's guidelines and regulations are set up to disproportionately affect the male student population") (emphasis

### 3.   Disparities in the Treatment of Yu and Complainant

Yu also contends that Vassar discriminated against him by providing Complainant with resources with which he, by contrast, was not provided. Specifically, he asserts that Complainant "had at her disposal a counselor whose practice was to write sexual misconduct complaints and whose documents reflect[] spending serious time with [Complainant.]" (Opp. at 21.) That an alleged victim of sexual misconduct would receive help from a counselor cannot reasonably be seen as a marker of anti-male gender bias. As Elizabeth Schrock, a coordinator of the Sexual Assault and Violence Prevention Program at Vassar stated in her deposition, similar services would be provided to a respondent, not just a complainant, if requested; indeed a male respondent had so been assisted in the past. (Bogdan Reply Decl. Ex. E at 44:2-12, 45:25-46:11.) Yu, on the other hand, admitted in his deposition that he had never requested such assistance. (Bogdan Decl. Ex. A at 106:9-11.) Yu's contention that "no one explained to him his rights and no one advised him of what services were available to him" (Opp. at 21) is belied by the materials Brown sent him along with his charges, which clearly lay out his rights – including mention of "resources and applicable student conduct procedures" in sexual misconduct cases – and which advised him to call both Brown and Horowitz to discuss the disciplinary procedures. (Bogdan Decl. Ex. C at 16, 17, 27-28.)

Yu further asserts that "disparate treatment was also manifest in the fact that while [his] request for an adjournment [of the hearing] was denied . . . given the impending midterm exams . . . [Complainant's] request for adjournment of her taking midterm exams was granted." (Opp. at 21.) As Vassar points out, Yu's request for an adjournment of the hearing is not comparable to

---

added).)  In any event, for the reasons discussed in note 6, it appears that even if Yu had asserted a disparate impact claim, no such claim is cognizable.

Complainant's request for an adjournment of a midterm. (Reply at 9; Yu Decl. Ex. F.) Yu iden-
tifies no further evidence that Vassar granted any accommodation to Complainant that they
denied him.

There is thus no genuine issue of fact that Vassar discriminated against Yu by granting
Complainant preferential treatment.

### B.  Selective Enforcement

As noted above, a selective enforcement claim under Title IX "asserts that, regardless of
the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the pro-
ceeding was affected by the student's gender." Yusuf, 35 F.3d at 715. "To support a claim of
selective enforcement, [a male plaintiff] must demonstrate that a female was in circumstances
sufficiently similar to his own and was treated more favorably by the University." Mallory, 76
Fed. App'x at 634. The male plaintiff must show that "the University's actions against [the male
plaintiff] were motivated by his gender and that a similarly situated woman would not have been
subjected to the same disciplinary proceedings." Doe, 687 F.Supp.2d at 757.

Yu contends that the severity of his penalty was a result of anti-male gender bias. (Opp.
at 22.) Recognizing that "no female at Vassar has ever been charged with sexual misconduct,"
however, he is unable to show that a female would be subject to more lenient sanctions. (Id.)
There is, however, evidence – upon which Yu himself relies – regarding a male student receiving
a lesser sanction for similar conduct, (Bogdan Decl. Ex. A at 90:10-16; Yu Decl. Ex. O), as well
as testimony regarding yet another student, whom Vassar asserts was male, being found not re-
sponsible in a sexual misconduct case. (Bogdan Reply Decl. Ex. B at 86:14-87:8; Reply at 9.)

Yu's additional argument that the panelists were not aware of nor would "even know how
to address" his allegation that Complainant made a false complaint against him in violation of

Vassar Regulations is not reflective of Vassar's policy. (Opp. at 22.) As Yu's own submissions point out, Vassar has in fact expelled female students for making false bias claims. (See Yu Decl. Ex. C; see also Ex. L at 116 (College Regulations providing that "[f]alse and malicious accusations of sexual or other harassment . . . may be the subject of appropriate disciplinary action").) In any event, while the panelists may not have been familiar with the procedures for addressing reports of false complaints, (see Inoa Dep. at 126:2-14; Harvey Dep. at 142:18-143:7), it is clear that, in this case, they credited Complainant's testimony and did not believe it to be false.

Yu has thus failed to adduce any evidence that would raise a triable issue as to whether the severity of his sanction was due to Vassar's gender bias.

## II.   Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

"In New York, the relationship between a university and its students is contractual in nature." Papaspiridakos v. Educ. Affiliates, Inc., No. 10-CV-5628-RJD, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013) aff'd, 580 Fed. App'x 17 (2d Cir. 2014). A college is "contractually bound to provide students with the procedural safeguards that it has promised." Fellheimer v. Middlebury Coll., 869 F. Supp. 238, 243 (D. Vt. 1994).

Because the Court has already found that Vassar did not violate any of its own procedures, Yu's contract claims based on the same purported violations fail for the same reasons.[27]

---

[27] Yu's Complaint alleges violations of certain other College Regulations that were not specifically addressed in the summary judgment briefing. These claims fail as well. First, Yu contends that Vassar "failed to review [Complainant's] Complaint for 'appropriateness and timeliness'" because Complainant made her report one year after the incident "without any corroborating record of a police report or evidence of [a medical] examination . . . ." (Compl. ¶ 58; Yu Decl. Ex. L at 114.) Yu points to no facts or legal authority providing that a report filed one year after an incident should be barred, or that corroborating police or medical records must be submitted, or that Vassar did not actually consider the "appropriateness and timeliness" of Complainant's allegations. This claim therefore fails.

Yu also alleges that Vassar "failed to provide [him] with a copy of the formal grievance complaint within 5 working days of [the EO/AA office's] receipt of the complaint, and failed to properly advise [Yu] of the college grievance policy and procedures." (Compl. ¶ 59; Yu Decl. Ex. L at 114.) As to receiving a copy of the complaint within five days, it is unclear if this provision even applies to the kinds of sexual misconduct charges at issue here

Yu's covenant of good faith and fair dealing claim fails as well, because a "breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claims must be dismissed." MBIA Ins. Co. v. GMAC Mortg. LLC, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct. 2010). "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Ely v. Perthuis, No. 12-CV-1078-DAB, 2013 WL 411348, at *5 (S.D.N.Y. Jan. 29, 2013) (quoting Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002)). Given that Yu's good faith and fair dealing claim is based on the same facts as his contract claim – namely, that Vassar breached the covenant by expelling Yu "notwith-standing the lack of evidence in support of [Complainant's] claim . . . other than [Complainant's] flimsy say-so" – this claim is dismissed as duplicative. (Compl. ¶ 93.)

### III.    General Business Law

New York General Business Law Section 349(a) "declares unlawful '[d]eceptive acts or practices in the conduct of any business.'" City of New York v. Smokes-Spirits.com, Inc., 12 N.Y.3d 616, 621 (2009) (quoting N.Y. Gen. Bus. Law § 349(a)). "To succeed on a claim under

---

since the College Regulations provide for a separate and more specific "Title IX Reporting Policy," which covers cases of "sexual assault [and] other forms of sexual misconduct" and does not mention any "formal grievance com-plaint." (Yu Decl. Ex. L at 120.) Even if this provision did apply to the charges here, there is no indication in the record that a "formal grievance complaint" had to be filed, or that Complainant ever did file such a document. The College Regulations state that "[a] formal grievance process may be initiated in person by meeting with the EO/AA Officer or in writing to the [EO/AA office]. . . . The college strongly encourages submission of grievances in writing . . . ." (Id. at 113 (emphasis added).) No formal grievance complaint thus needs to be filed. Indeed, in this case, the parties have not submitted such a document, nor does the record suggest that it ever existed. Instead, it appears that Complainant initially reached out to Vassar's Sexual Assault Response Team on February 18, 2013, indicating that she wished to report an incident of sexual assault. (Horowitz Aff. Ex. B.) The next day, she gave written statements to Horowitz and Squillace, and the investigation progressed from there. (Horowitz Aff. Ex. C.) These statements and other evidence were presented to Yu three days before the hearing, in accordance with Vassar procedures. (Bogdan Decl. Ex. C at 28; Def.'s 56.1 Statement ¶ 23.) The Court thus discerns no violation of College Regulations and no breach of contract. As to Vassar's alleged failure to advise Yu of the grievance policies, this claim is refuted by the record. Brown informed Yu of the charges against him and when the hearing would take place, provided him with copies of the pertinent College Regulations, and invited him to discuss the proceedings further. (Bogdan Decl. Ex. C.) Yu also maintained contact with Horowitz to ask questions and obtain further information. (Horowitz Aff. Ex. K; Ex. L.)

[New York General Business Law Section 349], plaintiff must demonstrate that defendant 'has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" Papaspiridakos, 2013 WL 4899136, at *6 (quoting Smokes-Spirits.com, Inc., 12 N.Y.3d at 621). The parties do not dispute that this standard applies to claims brought by students against educational institutions. (See Def.'s Br. at 20 (citing Papaspiridakos, 2013 WL 4899136, at *5); Opp. at 24-25.)

Yu asserts that Vassar violated the General Business Law "by causing [Yu] to believe that [Vassar] would follow the 'Vassar College Regulations' and 'Student Handbook'" and "by causing [Yu] to believe that if he paid tuition and fees to [Vassar], that [Vassar] would uphold its obligations, covenants and warranties to [Yu] described in the 'Vassar College Regulations' and 'Student Handbook.'" (Compl. ¶ 100.)

Even if a General Business Law claim could be cognizable against Vassar in this instance, Yu's claim fails since the Court has already determined that Vassar complied with its stated disciplinary procedures.

## IV.    Estoppel and Reliance

"Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." In re Vebeliunas, 332 F.3d 85, 93-94 (2d Cir. 2003) (citations omitted).

Yu's estoppel claim is based on his contention that he "relied to his detriment on [Vassar's] express and implied promises and representations" that Vassar "would not tolerate, and [Yu] would not suffer, harassment by fellow students and would not deny [Yu] his procedural rights should he be accused of a violation of 'Vassar College Regulations' or the 'Student Handbook.'" (Compl. ¶¶ 106-07.) Yu also claims that "Vassar made material misrepresentations of fact when it stated that it would not discriminate on the basis of sex and would treat women and men on terms of equality." (Opp. at 24.)

In light of the fact that the Court has already found that Vassar complied with its procedures and that there is insufficient evidence of gender discrimination against Yu, this claim fails.

## V.   Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between conduct and injury; and (iv) severe emotional distress." Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 122 (internal quotation marks omitted). The emotional distress suffered by the plaintiff "must be so severe that no reasonable person could be expected to endure it." Medcalf v. Walsh, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (internal quotation marks and alteration omitted).

Yu asserts that Vassar "intentionally and/or with willful or wanton indifference to the truth, engaged in conduct to remove [Yu] from Vassar . . . without regard to the truth of the allegations . . . made by [Complainant] and without evidence in support of [Complainant's] belated claims .

. . ." (Compl. ¶ 112.) Yu additionally asserts that Vassar "resorted to extortion tactics to require [Yu] to pay additional tuition for the balance of the semester, despite [Yu]'s expulsion, before providing him with his academic transcripts to apply to other colleges." (Compl. ¶ 113.) Yu's claims fail.

As discussed above, Yu has failed to show that Vassar conducted a procedurally flawed investigation and hearing, and has not produced sufficient evidence that he was expelled "without regard to the truth" or "without evidence in support of [Complainant's] claims." There is thus nothing extreme or outrageous about Vassar's actions. See Fraad-Wolff v. Vassar Coll., 932 F. Supp. 88, 93-94 (S.D.N.Y. 1996) (dismissing IIED claim where plaintiff failed to present evidence that he was "the target of a witch hunt by administrators at Vassar who sought to pin the blame for this incident on plaintiff regardless of his guilt or innocence," and where Vassar conducted an investigation and hearing to determine whether the plaintiff was involved); see also Fellheimer, 869 F. Supp. at 247 ("A College's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an IIED claim.").

As to the "extortion tactics" purportedly employed by Vassar, Yu has not provided any evidence – nor any legal authority – suggesting that Vassar's demanding of his tuition payment before releasing his transcripts was improper, much less that it was so outrageous as to be "utterly intolerable in a civilized community." Even if it were, Yu has not pointed to any evidence in the record showing that he suffered emotional distress so severe that "no reasonable person could be expected to endure it" because of Vassar's "extortionate" withholding of his transcript.

Yu's claim for intentional infliction of emotional distress therefore fails.

55

## VI.   Negligence

Yu asserts that Vassar breached its "duty of reasonable care in the conduct and investigation of the allegations of rape and sexual misconduct against him." (Compl. ¶ 118.) This claim fails as a matter of law because "[t]here is no cause of action in the State of New York sounding in negligent prosecution or investigation." Coleman v. Corp. Loss Prevention Assocs., 724 N.Y.S.2d 321, 322 (2d Dep't 2001); see also Weitz v. State, 696 N.Y.S.2d 656 (N.Y. Ct. Cl. 1999) (applying this rule to "administrative disciplinary charges brought against a college or university student").

Yu's retort that the Third Restatement of Torts identifies a "special relationship" in the school-student relationship does nothing to change controlling New York authority. (Opp. at 25.) To the extent that Yu's claim is based on his additional argument that a school has a "duty to protect students from harm inflicted by false allegations of sexual misconduct," (id.) because the Court has concluded that there is insufficient evidence to show that Vassar improperly found Yu responsible for sexual misconduct, this argument is unavailing.

Yu's claim for negligence therefore fails.

## VII.   Declaratory Judgment

Finally, Yu seeks a declaratory judgment that: "(i) the outcome and findings made by [Vassar] at [Yu's] [hearing] be reversed; (ii) [Yu's] reputation be restored; (ii) [Yu's] disciplinary record be expunged; (iv) the record of [Yu's] expulsion from [Vassar] be removed; (v) any record of [Yu's] [hearing] be permanently destroyed; and (vi) [Vassar's] rules, regulations and guidelines are unconstitutional as applied." (Compl. ¶ 126.)

Given that Yu has failed to establish his other claims, and the declaratory relief sought rests on those claims, his claim for declaratory judgment also fails. See In re Joint Eastern &

Southern Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) ("The Declaratory Judgment Act does not . . . provide an independent cause of action."); Propst v. Ass'n of Flight Attendants, 546 F. Supp. 2d 14, 22-23 (E.D.N.Y. 2008) (dismissing claims for declaratory relief where the substantive claims on which the declaratory relief was based were dismissed because "[t]he court may 'only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief'" (quoting In re Joint Eastern & Southern Dist. Asbestos Litig., 14 F.3d at 731)). Additionally, insofar as Yu is seeking a declaratory judgment as to a constitutional violation, such a claim must fail because Vassar is not a state actor.

## CONCLUSION

A thriving public debate is ongoing as to how colleges should support student victims of sexual assault while still assuring fairness to those who are accused of such conduct. Some have suggested that universities need to do more to encourage victims to report sexual misconduct and to ensure their physical and psychological safety during the investigation and hearing process. Others have assailed certain schools' policies as unfair and one-sided. The Court's role in a Title IX action such as this one, however, is limited to determining whether gender bias was a motivating factor behind an either erroneous outcome or unduly severe penalty. On the facts of this case, Peter Yu is unable to establish a genuine issue as to whether Vassar's determination that he sexually assaulted a fellow student and his subsequent expulsion were borne out of gender bias, or whether Vassar otherwise violated state law. Accordingly, Vassar's motion for summary judgment is granted and the case is dismissed.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt No. 54, and to close this case.

SO ORDERED.

Dated:      March 31, 2015
            New York, New York

Ronnie Abrams
United States District Judge